# Staunton.

## WILLIAM GRAY v. COMMONWEALTH.

### SEPTEMBER 19, 1895.

1. CRIMINAL LAW—*Uncommunicated Threats.*—The nature or character of uncommunicated threats, and whether they were recently made or not, must determine the propriety of their admissibility in evidence, if admissible at all.

2. INSTRUCTIONS—*Act of the Court.*—All instructions given are the instructions of the court, regardless of who requests them, and are to be considered together.

3. CRIMINAL LAW—*Motion in Arrest of Judgment.*—A motion in arrest of judgment lies only to correct an error apparent on the face of the record. It does not lie to correct an error in improperly receiving a juror, when the impropriety, if any, is only shown by a bill of exception.

4. CRIMINAL LAW—*Objection to Juror—When and for What Cause.*—After a juror has been fully examined on his *voir dire*, and has stated that he has not made up or expressed any opinion as to the guilt or innocence of the prisoner, and can give him a fair and impartial trial, and has been accepted without objection, an objection by a prisoner, unsupported by the affidavit of himself, or any one else, that he has discovered since the jury was sworn that the juror had been a deputy sheriff, and, two years before the trial, had a warrant for the arrest of the prisoner, and, with others, had pursued him for several days, and had several times visited the neighborhood in search of him, though no arrest was ever made, is not a valid objection, and does not entitle prisoner to a new trial—certainly not, when made for the first time after verdict.

5. CRIMINAL LAW—*Voluntary Manslaughter—Case at Bar.*—When it appears that the prisoner had ill-will towards the deceased, and immediately before the difficulty threatened to take his life with the deadly weapon with which he was armed; that he provoked him with words, and, after being warned, repeated them, as if to induce deceased to resent them, and that, immediately upon being struck, he used the deadly weapon, and continued to use it against the deceased until he had killed him, a verdict of voluntary manslaughter will not be disturbed by the appellate court.

Error to judgment of the Circuit Court of Botetourt county, rendered January 23, 1895, affirming the judgment of the County Court of said county, rendered November 16, 1894.

*Affirmed.*

The plaintiff in error was tried in the County Court of Botetourt on an indictment for murder, was found guilty of voluntary manslaughter, and sentenced to the penitentiary for five years. A writ of error was awarded by the Circuit Court, and on the hearing the judgment of the County Court was affirmed. To the judgment of the Circuit Court this writ of error was awarded.

On the trial in the County Court the following instructions were given, at the instance of the attorney for the Commonwealth, and against the objection of the prisoner :

" 1. The court instructs the jury : Every unlawful homicide is presumed by law to be murder in the second degree. If the Commonwealth would elevate the offence to murder in the first degree, she must prove the characteristics of that offence ; and if the prisoner would reduce the offence, the burden of proof is on him.

" 2. If the jury believe from the evidence that, previous to the time of the killing, there was a grudge on the part of the prisoner towards the deceased ; that the prisoner had previously declared that this grudge must be settled ; and that he killed the deceased because of this aforesaid grudge, then such killing was wilful, deliberate, and premeditated, and is murder in the first degree.

" 3. If the jury believe from the evidence that the killing aforesaid was malicious, but not wilful, deliberate, and premeditated, then such killing was murder in the second degree.

" 4. If the jury believe from the evidence that the prisoner killed the deceased in execution of a malicious purpose to do

the deceased a serious personal hurt by wounding him, the offence is murder.

" 5. Where death ensues on a sudden provocation, or upon a sudden quarrel, without prepense malice, the killing is manslaughter, and, in order to reduce the killing to self-defence, the prisoner must prove two things : First, that before the mortal shot was fired, he had declined any further combat, and had retreated as far as he could with safety ; and, second, that he killed his adversary through mere necessity.

" 6. Murder is the unlawful killing of any person with malice aforethought.

" 7. On a charge of murder, malice is presumed from the fact of killing.  When the killing is proved, and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown upon the accused.

" 8. When the killing is wilful, deliberate, and premeditated, the law infers malice from this fact.

" 9. A mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight, provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

" 10. On a trial for murder the necessity relied on to justify the killing must not arise out of the prisoner's own misconduct."

*J. W. Marshall, Sr., J. W. Marshall, Jr.,* and *G. W. Layman,* for the plaintiff in error.

*Attorney-General R. Taylor Scott,* for the Commonwealth.

RIELY, J., delivered the opinion of the court.

The prisoner was indicted in the County Court of Bote-

tourt county for the murder of John Barton. At the No-
vember term, 1894, of the court he was tried and convicted
of manslaughter, and the period of his confinement in the
penitentiary fixed at five years.

During the progress of the trial the prisoner offered to
prove that the deceased had made "threats against him," but,
it appearing that they had not been communicated to the
prisoner previous to the homicide, the court refused to admit
the evidence. What the threats were which he proposed to
prove the bill of exceptions does not disclose. Their nature
or character does not appear. Whether they were 'relevant
or material or proper we have no means of determining.
Nor does it appear whether they were made recently or long
prior to the killing. It is necessary that the bill of excep-
tions should disclose the nature of the threats, and whether
they were recently made or not, in order that we may deter-
mine upon the propriety of the admission of the evidence.
The omission renders it impossible for us to consider the mat-
ter intended to be raised by this bill of exceptions, and any
discussion of the important question when, if ever, uncom-
municated threats are admissible in evidence, would be out of
place.

When the evidence was closed the court, on the motion of
the attorney for the Commonwealth, gave the jury ten instruc-
tions, and at the instance of the prisoner, by his counsel, gave
to them three instructions. The prisoner excepted to all of
the instructions given for the Commonwealth. Without go-
ing into a detailed discussion of them, it is sufficient to say
that they correctly expound the law. They announce plain
and familiar principles of the law in relation to the offence
of homicide, and are expressed substantially in language that
has often received the sanction of this court. See *Bristow's
Case*, 15 Gratt. 634; *Honesty's Case*, 81 Va. 283; *Lewis's
Case*, 78 Va. 732; and *Vaiden's Case*, 12 Gratt. 717. The

Opinion.

three instructions given for the prisoner are as favorable to him as the most favorable view of the evidence given on the trial by himself and his witnesses would justify. All of the instructions are in fact the instructions of the court, whether given at the instance of the Commonwealth or of the prisoner, and are to be read together; and, so considering them, they set forth the law of the case upon the whole evidence correctly and fairly.

After the jury had rendered their verdict the prisoner moved the court in arrest of judgment, on the ground that one of the jurors was incompetent; which motion the court overruled. It appears from the bill of exceptions that the juror, when examined on his *voir dire,* suggested himself that he might not be competent to serve, as he was deputy sheriff when the killing took place, which was more than two years prior to the trial, and had the warrant for the arrest of the prisoner, but, on being fully examined by the court, answered that he made no arrest and had not formed or expressed any opinion as to the guilt or innocence of the prisoner, and could give him a fair and impartial trial. He was thereupon accepted by the court as a juror, without objection from either side. The prisoner claimed that he had discovered, after the jury was sworn, that the said juror had not only the warrant for his arrest, but also, with a number of other persons, had pursued him for some days, and had several times visited the neighborhood in search of him. It is not the province of a motion in arrest of judgment to correct an error like the one alleged. That lies only to correct an error that is apparent on the face of the record. *Commonwealth v. Stephen,* 4 Leigh 679; *Watt's Case,* Id. 672; Bishop on Cr. Pro. (3d ed.), sections 1282 and 1285; and 4 Minor's Institutes (3d ed.), Pt. I., 939. The ground of the objection nowhere appears in the record. This bill of exceptions was not, therefore, properly taken. But even if the proper proceed-

ings had been resorted to, the statement set forth in the bill of exceptions, which is not supported by the affidavit of the prisoner or any one else, did not disqualify the juror or furnish ground for a new trial, and certainly not when the objection was not brought to the attention of the court until after the verdict. *Bristow's Case, supra*.

The remaining assignment of error relates to the refusal of the court to grant the prisoner a new trial, upon the ground that the verdict was contrary to the law and the evidence.

The homicide was committed on July 11, 1892, as the deceased, the prisoner, and several other persons were returning home from the County Court. They left Fincastle together, but, after going some distance, the deceased and two of the others (not the prisoner) stopped for a while. The deceased had been drinking freely during the day, and was drunk. Starting on home again, the deceased and his two companions overtook the prisoner and the persons who had gone ahead with him, they having also stopped. It was then after nightfall and dark. When the deceased rode up the prisoner "bantered" him for a horse trade. He replied: "All right; that there had been an old fuss between them, but that was over now." Saddles were exchanged, and the prisoner mounted the horse of the deceased, which was being ridden by his son-in-law, and rode it to the foot of the hill and back. Finding that the horse was blind, he demanded to rescind the trade, and ordered Charles Thompson, a colored man, who had changed the saddles, to put them back as they were, which he did. The deceased then mounted, and, after riding up the road away from the crowd, returned and asked if he was on the right horse. As he came back the prisoner said, according to one witness: "That man has a grudge against me and it must be settled"; and according to another witness: "There is an old grudge between us, and it's got to be settled

now, and I'll shoot his heart out." When the deceased got back where the prisoner was the prisoner said something to him which evidently provoked and irritated him, but which was not heard by the persons present. The deceased replied that if he said that again he would mash his mouth. The prisoner repeated it, and the deceased, after stooping down and feeling around on the ground as if for a stone, went up to the prisoner and struck him. The prisoner immediately drew his pistol and fired. The deceased repeated the blow, having hold of the prisoner, and the latter again fired. The deceased then struck the prisoner a third blow, which knocked him down, and got on him, when the prisoner fired the third and fatal shot, from which the deceased died in a few minutes. The deceased had a knife, but was otherwise unarmed. His knife was picked up, after his death, some ten steps from the place where the scuffle between him and the prisoner took place. It was unopened. Nor was there any blood upon it, or other evidence that it had been used by him in the fight. He was not seen to have a rock in his hand, or other weapon, when engaged in the fight, nor is there any evidence that any was found after his death. The last and fatal shot penetrated the body of the deceased just above the left lung, and one of the other shots passed through his clothing at the pocket on the right side. The prisoner immediately fled, calling back as he ran to take care of his horse. After being a fugitive for more than two years, he returned and surrendered himself.

It thus appears that the prisoner had ill-will towards the deceased, and had, just before the difficulty commenced, threatened that he would take his life with the deadly weapon with which he was armed; that he provoked him with words, and, after being warned, repeated them, as if to induce the deceased to resent them; and that immediately upon being struck he used the deadly weapon with which he was armed,

and continued to use it against the deceased until he had slain him.   Instead of avoiding a difficulty, he seems to have invited it.   The jury found him guilty of voluntary manslaughter.

Upon the evidence, as certified and considered by us, under the familiar rule prescribed in such case (section 3484 of the Code), we see no ground to interfere with the verdict.

The judgment of the Circuit Court must be affirmed.

*Affirmed.*