# Richmond.

## Brown v. Commonwealth..

### April 10, 1924.

1. HOMICIDE—*Malice—Presumptions and Burden of Proof.*—As a general proposition, malice is presumed from the fact of killing unaccompanied with circumstances of extenuation, and the burden of disproving malice is thrown upon the accused.

2. HOMICIDE—*Malice—Sudden Heat of Passion—Provocation.*—Where a homicide is committed in the course of a sudden quarrel or mutual combat, or upon a sudden provocation, without any previous grudge, even if the killing be not done in self-defense, the test of whether the killing is from the sudden heat of passion is found in the nature and degree of the provocation and the manner in which it is resented.

3. HOMICIDE—*Malice—Presumption from Killing—Provocation.*—It is only where the killing is "without any or upon very slight provocation that malice may be inferred from the mere fact of the killing, and that the slayer may be found guilty of murder." That is to say, in such case, as in others, malice, and hence "murder," is presumed from the fact of killing, unaccompanied by circumstances of extenuation;" but, where there is provocation which is more than "very slight," such presumption does not arise.

4. HOMICIDE—*Malice—Presumption from Killing—Instructions—Evidence Insufficient to Support Verdict of Guilty—Case at Bar.*—In the instant case, a prosecution for homicide, there was no evidence of a previous grudge between the parties, but, on the contrary, the only evidence introduced by the Commonwealth showed that the parties were friends. The parties had been engaged in a game of craps and it appeared that deceased had seized money won by defendant, had struck defendant over the head with a bottle, and was advancing upon defendant when defendant shot him.

   *Held:* That the killing was accompanied with such circumstances of extenuation that malice and hence murder could not be presumed from the fact of the killing; that, therefore, there was no evidence or presumption of malice upon which to base an instruction as to the presumption arising from the killing, unaccompanied with circumstances of extenuation; and that there was no evidence before the jury to support a verdict of murder in the second degree.

5. CRIMINAL LAW—*Variance—Indictment and Proof.—Name of Deceased.*— In a prosecution for homicide a variance between the indictment and proof as to the name of the person killed was assigned as error. The alleged variance was between the names Wester Stith and Wesley Stith. The entire case was proceeded with upon the idea that Wester Stith and Wesley Stith were one and the same person, and the accused testified as to the identity of the person killed.
   *Held:* That the point was purely technical, and under section 4878 of the Code of 1919 was not ground for reversal.

6. CRIMINAL LAW—*Protection of Accused—Enforcement of the Criminal Laws.*—It is axiomatic that an accused, when placed upon trial for his life or liberty, is to have thrown around him every safeguard known to the law, in order that he may be afforded a fair and impartial trial. On the other hand, it should be the policy of the courts in the enforcement of the criminal laws "to hold to the substance and let the shadow go," lest confidence in the law as a rational rule of conduct be impaired and resort to tumultuary and violent methods for the punishment of crime be encouraged, which all deplore as a blot upon our civilization.

Error to a judgment of the Circuit Court of Southampton county.

*Reversed.*

The opinion states the case.

*John N. Sebrell, Jr.,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

Washington Brown, on the night of June 13, 1922, shot and fatally wounded one Wesley Stith, in the town of Drewryville, Southampton county. On the 17th day of July of the same year, there was found in the circuit court an indictment against the accused, charging him with the wilful, deliberate and premeditated killing of Stith. On this indictment the accused

was tried and found guilty of murder in the second degree, and his punishment fixed by confinement in the penitentiary for a period of twelve years.

The assignments of error are three in number:

(1) "The court erred in overruling the motion to set aside the verdict as being contrary to the law and the evidence.

(2) "The court erred in its instructions to the jury.

(3) "There is a variance between the indictment and the proof as to the name of the person killed."

The material testimony as to the homicide, relied upon by the Commonwealth to sustain the verdict of the jury, is as follows:

Lewis Seaborn, an eye-witness, testified: "In June, 1922, I was working as one of the hands on the section for the Southern Railway Company, together with Wesley Stith, and he and I roomed together in a house fronting on the railroad in Drewryville. The evening of June 13th Wesley Stith and I met Washington Brown and Robert Persons in Drewryville, and arranged with them to have a crap game at our shanty that night. We had often played before and all of us were friends. I went on ahead of the others and Wesley Stith, Washington Brown and Robert Persons came on together a little later. We engaged in a game of crap. We had a Coca Cola bottle with some kerosene oil in it and a rag, which we lighted and used for a lamp. Washington Brown, the accused, got broke and stopped playing. I also stopped playing and left Wesley Stith and Robert Persons continuing playing. After a while Robert Persons got broke and he asked Washington Brown if he would go to his (Persons') house a few hundred yards away and get Persons' pistol for the purpose of pawning it to get money upon which to continue the game, and Washington Brown

left and came back after a while with Robert Persons'
pistol. Robert Persons gave me the pistol and I gave
him two dollars on the same. He gave one dollar to
Washington Brown and he and Brown and Stith then
continued the crap game. Robert Persons won his
money back, paid me the two dollars he had borrowed
from me on the pistol, and I returned the pistol to him.
I went to sleep, leaving them playing in a friendly
manner. I had been asleep some time when I was
awakened by the sound of a pistol shot. When I
awoke the light was out, but I could see from the faint
moonlight in the room Wesley Stith standing at the
foot of the bed and Washington Brown, with a pistol
in his hand, was standing at the door about six feet
away. The door was open. Wesley Stith broke for
Washington Brown. I mean by that that he advanced
on Washington Brown, who was doing nothing at the
time but holding the pistol. When Wesley Stith ad-
vanced upon him, Washington Brown shot him twice
and Wesley Stith fell forward, almost falling on Wash-
ington Brown. Washington Brown then went out of
the door and left. Washington Brown did not have
any pistol, and the only pistol there was that had by
Robert Persons. I do not know what took place be-
tween the time that I went to sleep and the time the
first pistol shot fired. I went out and got some other
folks and we came back and moved the body out of
the door so that we could shut the same."

The only evidence introduced by the accused as to
the main transaction was that of Brown himself, who
testified as follows:

"For about six years I worked for the Camp Manufac-
turing Company at Arringdale until they shut down
their mill, and then I went to work for Mr. H. H. Gay.
The night that Wesley Stith was killed, he asked Rob-

ert Persons and me to go with him and Lewis Seaborn, who stayed in the railroad section house with him, to shoot crap. Lewis Seaborn went on ahead and Robert Persons, Wesley Stith and I went on together afterwards. We commenced the game and I did not have but a dollar and I lost that and got out of the game, but set there, the others playing. Presently Lewis Seaborn had won most all the money and he stopped and set on the bed, leaving Wesley Stith and Robert Persons still playing and Robert Persons got broke. He told Lewis that he had a pistol that he would put in pawn if he would lend him $2.00, and Lewis agreed to do this and he asked me to go and get the pistol, and he would give me a dollar. I went and got the pistol, gave it to Robert and he deposited it with Lewis Seaborn and Lewis gave him $2.00, and Robert gave me one of them, and then Robert and Wesley and I continued the game. We played for some time when Wesley grabbed the money which I won. I told him to give me the money and he said I will give you a bottle fit. He had the money in his right hand and he grabbed the Coca Cola bottle which we was using for a lamp and he struck me over the head, knocking me down on my knees. He split my head open, leaving a scar there now (which scar the accused exhibited to the jury). I was making to the door and just as I got to the door he was advancing on me from the inside of the room when Robert Persons handed me the pistol and told me to shoot. I shot first through the window and not at him, thinking that I might make him stop. He did stop for the second when I shot, but after stopping he continued to come toward me. The door was shut a part of the way, and I thought that he put his hand in his hip pocket, and I thought that he was going to kill me. The light went out when he struck

me with the bottle. I was afraid to turn around, afraid he would shoot me. I knew he had been carrying a pistol, and I shot him to keep him from killing me. He was bigger than I was. If I had not had the pistol I would have fought him the best I could as I was doing, but he was bigger than I was and he had already knocked me down with the bottle and I expected him to beat me or kill me, and I shot him to protect myself. When I shot him he kept on coming and like to fell on my feet. I got out the door and Robert told me to give him the pistol, which I did and then went to my mother's down in North Carolina. My mother lives at Macon, and I went to her house. On the way I saw Willie Pearson and I told him that I had shot Wesley Stith and I had shot him with a real pistol. I went down to my mother's in North Carolina because I knew that whether I was guilty or innocent that I would be arrested and put in jail, and I would not have a chance to employ counsel nor to arrange for my defense. I, therefore, went to my mother's in North Carolina, and soon after I got there I called Mr. Gay, my employer, up over the 'phone and told him where I was and I wanted to come back and give myself up, and told him I would do so if he would employ a lawyer to defend me. I have a wife and one little child."

[1] Several instructions were given by the trial court, among the number one, given by the court of its own motion, is as follows:

"Malice is presumed from the fact of killing *unaccompanied with circumstances of extenuation,* and the burden of disproving malice is thrown upon the accused." (Italics supplied.)

This principle of law has repeatedly been upheld by this court. *Muscoe's Case,* 86 Va. 451, 10 S. E. 534; *Gray's Case,* 92 Va. 774, 22 S. E. 858; *Hall's Case,* 89

Va. 178, 15 S. E. 517; *Lewis' Case*, 78 Va. 733; *Horton's Case*, 99 Va. 852, 38 S. E. 184; *Honesty's Case*, 81 Va. 291.    As a general proposition, it is without objection. The test, however, as to the correctness of the instruction complained of, in the instant case, is whether or not there was any theory, either presumptive or otherwise, which warranted the trial court in giving this instruction to the jury.

[2] As said by Sims, J., in the case of *Richardson* v. *Commonwealth*, 128 Va. 695, 696, 104 S. E. 790, "It has been long settled that where a homicide is committed in the course of a sudden quarrel, or mutual combat, or upon sudden provocation and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation, it is not murder, but is manslaughter only—voluntary manslaughter, if there be no further justification, and involuntary manslaughter if the killing be done in the commission of some lawful act, such as in justifiable self-defense."    To the same effect see *Read's Case*, 22 Gratt. (63 Va.) 924, and *Byrd's Case*, 89 Va. 536, 16 S. E. 727, and the authorities therein cited.

"Where a homicide is committed under such circumstances, without any previous grudge, even if the killing be not done in self-defense, it has also been long settled that the test of whether the killing is from the sudden heat of passion aforesaid is found in the nature and degree of the provocation and the manner in which it is resented."    *Read's Case, supra.*

[3] As to the nature and degree of the provocation, where it is in fact resented, it is only where the killing is "without any, or upon very slight, provocation that malice may be inferred from the mere fact of the killing, and that the slayer may be found guilty of murder."

That is to say, in such case, as in others, malice and hence, "murder," is presumed from the fact of killing, unaccompanied by circumstances of extenuation" (*Lewis' Case,* 78 Va. 732), but, where there is provocation which is more than "very slight" such presumption does not arise. *Hill's Case,* 2 Gratt. (43 Va.) 599; *Willis' Case,* 32 Gratt. (73 Va.) 932; *Wright's Case,* 75 Va. 914; *Gray's Case,* 92 Va. 772, 22 S. E. 858; *Murphy's Case,* 23 Gratt. (64 Va.) 960; *Jones' Case,* 100 Va. 842, 41 S. E. 951; *Horton's Case,* 99 Va. 848, 38 S. E. 184; and *Richardson's Case,* 128 Va. 691, 104 S. E. 788.

In the case before us there is no evidence of a previous grudge. On the contrary, the only evidence introduced by the Commonwealth throwing any light upon the relations of the accused and the deceased to each other was that of Lewis Seaborn, who testified: "We had often played before *and all of us were friends.*" (Italics supplied.) "I went to sleep leaving them playing in a friendly manner."

[4] It is earnestly contended by counsel for the accused that the killing was done in justifiable self-defense, and that this court should so declare. This question we deem it unnecessary for us to decide, but the killing, from the testimony in the case, was, in our view, after a careful consideration of the same, certainly accompanied "with such circumstances of extenuation that malice and hence murder could not be presumed from the fact of the killing."

This being true, there was no evidence or presumption of malice upon which to base the instruction. There being no foundation upon which the instruction could be placed, it necessarily follows there was no evidence before the jury to support their verdict of murder in the second degree.

We do not mean, however, by the conclusions reached in the instant case to disturb in the least the well settled rule that "on a charge of murder, malice is presumed from the fact of killing. When the killing is proved and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown upon the accused." *Horton's Case*, 99 Va. 852, 38 S. E. 184.

[5] As to assignment of error number 3, in regard to the alleged variance between the indictment and the proof, as to the name of the person killed, we are of opinion that there is no merit in this assignment. The evidence shows conclusively there was never any question as to the identity of the person killed. The entire case was proceeded with upon the idea that Wester Stith and Wesley Stith were one and the same person. In fact, the accused testified as to the identity of the person *he* killed.

In the case of *State* v. *Reese*, 27 W. Va. 375, 380, an indictment charged the accused with the larceny of goods, the property of Robert Buster, while the proof was that the owner of the goods was James Robinson Buster, who was sometimes called Rob, Robinson and Bob Buster. It was contended that a new trial should be granted for variance between the allegation and the proof, but the court held this was not a material variance.

The point raised is purely technical and it is to meet just such a point as the one under consideration that the revisors wrote into the Code of 1919, section 4878, declaring that "if, on the trial of any case, there shall appear to be any variance between the allegations of the indictment and the evidence offered in proof thereof, it shall be competent for the court before which the trial is had to amend the said indictment, according

to the proof, provided such amendment does not change the nature of the offense charged * * *." This section, while preserving to an accused every substantial right guaranteed under the Constitution, yet at the same time deprives him of the opportunity of availing himself of a mere technicality to balk and in many instances to defeat the very ends of justice itself.

[6] It is axiomatic that an accused, when placed upon trial for his life or liberty, is to have thrown around him every safeguard known to the law, in order that he may be afforded a fair and impartial trial. On the other hand, it should be the policy of the courts in the enforcement of the criminal laws "to hold to the substance and let the shadow go," lest, as said by Keith, P., in the dissenting opinion in the case of *Jones* v. *Commonwealth*, 100 Va. 859, 41 S. E. 957, we "impair and undermine confidence in the law as a rational rule of conduct, and tend to encourage resort to tumultuary and violent methods for the punishment of crime, which all deplore as a blot upon our civilization."

In any event, this question is not likely to arise in a future trial of this case.

Having reached the conclusion that the trial court erred in giving to the jury the instruction complained of, the case must be reversed and the same remanded to the circuit court for a new trial.

*Reversed.*