# Richmond

## Russell O. Thomason v. Commonwealth of Virginia.

November 24, 1941.

Record No. 2501.

Present, All the Justices.

490

The opinion states the case.

*T. W. Messick,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers, Special Assistant,* for the Commonwealth.

Eggleston, J., delivered the opinion of the court.

Russell O. Thomason, indicted for the murder of Clyde Wilson Kirk, has been found guilty by a jury of murder in the second degree, and his punishment fixed at five years confinement in the penitentiary.

The principal assignment of error is that the evidence is not sufficient to sustain the verdict.

Both the accused and the deceased were middle-aged married men. About ten years prior to the homicide they had lived as next-door neighbors. Thomason's attentions to Mrs. Kirk ended the friendly relations of the two men and they had not spoken to each other for a number of years. There is evidence that Kirk had made a number of threats against Thomason and that these had reached Thomason's ears.

The homicide occurred on the night of July 15, 1940, at the plant of the Southern States Mill, in Roanoke county, where Thomason was employed and while he was engaged in superintending the unloading of corn from a freight car which was standing on a siding in front of the mill. The mill faces in a northerly direction, and in front of it is a concrete platform about nine feet wide. The building is entered from the platform through a door about six feet wide. The siding on which the freight car was located runs parallel to and is just north

of the platform. The car had been placed on the siding so that its door was west of and not directly opposite the doorway leading into the building.

Kirk, who lived near by, came to the mill to procure some grain doors which Howard Patton, one of the mill employees, had authorized him to remove from the premises. He entered the freight car through a door on its far side and stood for a few minutes talking to Paul and Howard Patton, who were shoveling corn from the eastern end of the car to the conveyor which led from the center of the car into the mill. While Kirk was in the car, Thomason entered and hung up a light on an extension cord for the purpose of facilitating the unloading of the car. Both he and Kirk observed each other but no word passed between them. After a few minutes Kirk left the freight car through the door leading to the platform. He walked past the mill door to the eastern end of the platform where he smoked a cigarette. At this time Thomason was standing in the lighted doorway of the mill. Kirk left the eastern end of the platform and proceeded toward the mill doorway. When he reached the door he was struck a single blow over the head with a pick handle by Thomason. The blow was a severe one. It struck Kirk over the right eye, crushed his skull, injured his brain, rendered him immediately unconscious, and resulted in his death within twenty-four hours.

Swanson and Lantz, two witnesses who were sitting on the edge of the platform east of the mill door, heard the blow and ran to Kirk who was unconscious and who lay with his feet toward the door and his head toward the outer edge of the platform. Paul and Howard Patton also came from the freight car where they were working. They heard Thomason say, pointing to an open knife beside Kirk's body, "You see what he came after me with. He told me he was going to cut my heart out."

Realizing that Kirk was seriously injured, Thomason phoned for an ambulance and for the sheriff.

The above are the undisputed facts. As to what occurred just prior to the striking of the blow which felled the deceased, the evidence is in hopeless conflict.

Howard Patton testified that he happened to look through the car door and saw Thomason leaning against the eastern doorpost. He could not tell whether Thomason had anything in his hand. Suddenly he saw Thomason swing a pick handle "left-handed over his left shoulder" and strike at some one standing near by. While the witness saw the outline of the person who was being struck, he did not at first know his identity. He was asked this question: "Just what was that man doing just before he was struck with the pick handle?" His reply was, "He wasn't doing anything that I know of, just standing there on the platform." He further testified that at the time the blow was struck the man who was hit and who turned out to be Kirk, had his left side to Thomason.

Paul Patton testified that while Thomason was standing in the lighted doorway the person whom he struck was in the shadow and, therefore, was not clearly seen by him (the witness).

Swanson, another witness on behalf of the Commonwealth, was sitting on the edge of the platform opposite the eastern frame of the door leading into the mill. He testified that although Kirk's head fell within three feet of where he (the witness) was sitting, and although he heard the blow, he did not hear any words exchanged between the accused and the deceased.

Lantz, who was sitting on the edge of the platform east of Swanson, likewise heard no exchange of words before the blow was struck.

However, both of these witnesses admit that the noise of the mill machinery may have prevented their hearing any conversation or words which may have passed between Thomason and Kirk. Hence, the brief of the Attorney General quite fairly states, "The Commonwealth cannot claim there was positive direct testimony that no threats were made" by Kirk to Thomason.

The story of Thomason, the accused, is that he was standing against the western (*sic*) end of the doorframe when he saw Kirk come out of the freight car and walk past the mill doorway toward the eastern end of the platform where Swanson and Lantz were sitting; that in a few minutes Kirk turned and came toward him (Thomason); that when Kirk was about two feet away he said to Thomason, "I am going to cut your damn heart out"; that at the same time Kirk, with an open knife in his right hand, lunged toward him (Thomason); that he (Thomason) "fell back from the doorway and grabbed a pick handle which was behind the door along with a wrench and some other tools"; and that he (Thomason) then struck Kirk over the head with the pick handle.

Thomason further testified that about an hour and a half before the altercation the husk conveyor which was in operation became clogged, that when this happened, as it frequently did, it was necessary that the stoppage be relieved by pounding on the pipe with a wooden stick, that a broom handle had been customarily used for that purpose but since it was out of place on this occasion, he removed the pick from the handle and used the latter to correct the stoppage in the conveyor, and that after having done this he placed the pick handle near the door, where he was later standing.

The Commonwealth's contention is that the jury had the right to disregard Thomason's story *in toto*; that when this was done it had the right to infer from the Commonwealth's evidence that Thomason, seeing Kirk on the premises and anticipating trouble, armed himself with the pick handle which he concealed near the door; and that when he later saw Kirk with an open knife in his hand, he (Thomason) became unduly alarmed for his safety and struck him, although the latter, according to the testimony of Howard Patton, had committed no overt act which threatened actual harm to the accused.

The Attorney General argues that if there had been any such encounter, as Thomason detailed, it would have taken place in front of the door leading into the mill, where the actions of the two men would have been plainly visible from the light shining through the doorway, and would have been observed by both Paul and Howard Patton who, he says, were looking at the scene of the alleged altercation at the time of its occurrence. Since neither of these witnesses saw any such altercation, it is argued that it never took place.

This argument does not survive an analysis of the situation. According to the testimony of both of the Pattons, just before the blow was struck Thomason was standing at the eastern end of the doorway, and the undisputed testimony is that Kirk approached from the eastern or darkened end of the platform. Thus, neither Thomason nor Kirk came clearly between the light from the doorway and the point in the car where the Pattons were standing. In fact, Paul Patton testified that at the time the blow was struck, Thomason was standing in the light and Kirk was standing in the dark, and that before the actual blow he could see neither Thomason nor Kirk.

While Howard Patton testified that at the time the blow was struck, Kirk "wasn't doing anything that I know of, just standing there on the platform" with his "left side" toward Thomason, he had previously testified that while he could distinguish some object at which Thomason was striking, "I couldn't just exactly see his face, who he was swinging at." It also developed, on cross examination, that at the preliminary hearing Howard Patton had testified that, "I couldn't see Mr. Kirk from where I was on account of the dust."

Moreover, it does not appear from the testimony that either of the Pattons was looking at Thomason for any length of time prior to the striking of the blow. Paul Patton testified that just as he "glanced back" he saw "Thomason make a swing." Consequently, he did not

know what had previously taken place between the two men. Howard Patton did not testify as to how long he had been observing the two men when the blow was struck. At the preliminary hearing he said, ''I happened to look up and then I looked back and looked up again, and I happened to see him make a swing'', which indicates that he had a mere glimpse of the two men at the time the blow was struck.

Consequently, it is entirely possible that these two witnesses may not have seen the overt act of Kirk which preceded the blow.

Again, Howard Patton's statement that at the time the blow was struck Kirk was standing with the left side of his face exposed to Thomason is inconsistent with the physical facts. The undisputed evidence is that Thomason is left-handed and delivered a left-handed blow which struck Kirk over the right eye. This would indicate that Kirk was facing Thomason.

There is nothing inherently incredible in Thomason's story. In the main it is not contradicted by any witness. Hence, we cannot agree that the jury had the right to totally disregard it. Indeed, the fact that the jury fixed the punishment at the minimum for murder in the second degree shows that it gave some credence to Thomason's testimony.

Giving to Thomason's testimony the credence it deserves, we think the homicide was accompanied by such extenuating circumstances as to preclude a finding that the accused was guilty of murder in the first or second degree. The undisputed evidence shows that Thomason did not seek this encounter. He was at work where he had the right to be. He knew that Kirk had repeatedly made threats against him. Assuming that Kirk had the right to be on the premises, it is undisputed that just before he received the fatal blow he had in his hand an open knife and was facing and approaching the accused. Under such circumstances of extenuation there is no presumption of malice, and hence the

accused cannot be convicted of murder in either the first or second degree. *Brown* v. *Commonwealth,* 138 Va. 807, 814, 122 S. E. 421; *Richardson* v. *Commonwealth,* 128 Va. 691, 696, 104 S. E. 788.

It follows, then, that there was no basis for the granting of the Commonwealth's Instructions Nos. 1, 2 and 4, under which the jury could have found the accused guilty of murder in the first or second degree.

In our opinion the court erred in granting Instruction No. 7, which is as follows:

"The court instructs the jury that the bare fear that a man intends to commit murder or other atrocious felony, however well grounded, unaccompanied by any overt act indicative of any such intention, will not warrant killing the party by way of prevention. There must be some overt act indicative of *eminent* danger at the time."

While the instruction embodies a correct statement of the law (*Stoneman* v. *Commonwealth,* 25 Gratt. (66 Va.) 887; *Mercer* v. *Commonwealth,* 150 Va. 588, 142 S. E. 369; *Vlastaris* v. *Commonwealth,* 164 Va. 647, 178 S. E. 775), it is not applicable here. There is no evidence that the accused acted upon "bare fear". On the contrary, the uncontradicted evidence of Thomason is that he struck Kirk after the latter had committed the overt act of attacking him with an open knife.

Counsel for the plaintiff in error earnestly contends that despite the adverse verdict of the jury, this is a case of justifiable homicide, and that we should so hold. With this contention we cannot agree.

Justifiable homicide in self-defense is an affirmative defense based upon necessity. The necessity to kill must affirmatively appear from the evidence adduced by the accused unless the fact appears from the Commonwealth's own evidence or other circumstances in the case. *Potts* v. *Commonwealth,* 113 Va. 732, 734, 73 S. E. 470.

The right to kill begins where the necessity begins and ends where it ends. *Fortune* v. *Commonwealth,* 133

Va. 669, 689, 112 S. E. 861; *Byrd* v. *Commonwealth,* 89 Va. 536, 540, 16 S. E. 727.

Here it does not conclusively appear from either the evidence of the accused or that of the Commonwealth, that necessity to kill existed at the time the fatal blow was struck. Although Kirk may have been the aggressor in the first instance, and the necessity to kill may have been apparent to the accused when the latter seized the pick handle in self-defense, yet the jury may have concluded from the testimony of Howard Patton (who said that Kirk "wasn't doing anything" at the time the blow was struck) that Kirk had abandoned the attack on the accused. If this be so, the necessity for Thomason's killing Kirk had ended, and the accused would be guilty of voluntary manslaughter. *Byrd* v. *Commonwealth, supra.*

Again, while the accused testified that he grabbed the pick handle in self-defense after Kirk had lunged at him with an open knife, he made no claim that thereafter Kirk continued the attack. On cross examination he was three times asked the question, "Was he (Kirk) still coming at you when you hit him?" and in each instance he gave an ·evasive answer. Thus the accused himself does not say that the necessity to kill existed at the time the fatal blow was struck.

In our opinion it is for the jury to say, under proper instructions, whether the killing was done in justifiable self-defense or whether the accused was guilty of voluntary manslaughter. *Wilkins* v. *Commonwealth,* 176 Va. 580, 584, 11 S. E. (2d) 653, 655.

By the final assignment of error the accused contends that the court erred in permitting the Commonwealth to introduce, in rebuttal, evidence of the reputation of Kirk, the deceased, as a peaceful and law-abiding citizen. Reliance is placed upon *Dock* v. *Commonwealth,* 21 Gratt. (62 Va.) 909. There it was held that on a trial for murder it is not competent for the Commonwealth to introduce evidence *in chief* as to the char-

acter of the person on whom the offense was committed. This is so because until the reputation of the deceased has been attacked it is presumed to be good. 1 Wharton's Criminal Evidence, 10th Ed., § 57.

But the converse of the proposition is equally true,— that is, if the accused opens the door by introducing evidence of the character of the deceased, the Commonwealth may in rebuttal show the latter's good character. *Dock* v. *Commonwealth, supra* (21 Gratt. (62 Va.), at page 911).

In the case at bar the accused offered evidence that Kirk, the deceased, had on numerous occasions made threats against him (the accused). It is generally held that the proof by the accused of such threats is a direct attack on the character of the deceased and justifies proof by the prosecution, in rebuttal, of the prior good character of the deceased. See Wharton's Criminal Evidence, 10th Ed., § 57. See also, the recent case of *State* v. *Pusey,* 118 W. Va. 95, 188 S. E. 745, 747, where the pertinent authorities are collected.

We hold, therefore, that there was no error in the admission of the evidence in rebuttal of the good character of the deceased.

For the reasons stated the judgment complained of will be reversed and the case remanded for a new trial.

*Reversed and remanded.*