# Staunton

JOHN COLEMAN, JR. V. COMMONWEALTH OF VIRGINIA.

September 5, 1945.

Record No. 2967.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*F. H. Combs*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *M. Ray Doubles, Assistant Attorney General*, for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

John Coleman, Jr., twenty-three years of age, was indicted for the murder of one Clyde Duty, tried by a jury, found guilty of murder in the second degree, and sentenced to ten years in the penitentiary.

On a Saturday evening in July, 1944, between six and seven o'clock, John Coleman, Jr., the accused, and his friend, Willard Kelly, were in the town of Grundy, near the north end of Slate· Creek bridge. There were many miners in town that evening. Coleman and Kelly walked toward the north end of the bridge and as they approached the bridge they saw two acquaintances, Junior Dales and Tolby Kiser, approaching them. At or near the end of the bridge was a barbershop with shower baths and toilets in the basement, with steps reaching from the basement to the sidewalk near the north end of the bridge. Clyde Duty, who later was killed, came up these steps from the toilets and on to the sidewalk near where Coleman and Kelly were. As Dales and Kiser approached to within a few feet of Coleman and Kelly, Coleman directed these remarks to Kiser: "Hello there you big bird." Kiser at that time was within four feet of Coleman. ·

Clyde Duty was a stranger to all of the young men. They had never seen him before. As he reached the sidewalk from the toilet he spoke these words to Coleman: "Are you talking to me, you son-of-a-bitch". Coleman replied, "No, I am talking to Tolby Kiser". Duty persisted in repeating the epithet many times. He was intoxicated. Each time Coleman protested, saying that he was not referring to Duty. Finally Duty said to Coleman: "If you should call me that, you damn little rascal, you would have me to whip." Coleman stated to Duty, "I don't want no trouble out of you." Duty had a bottle in his hand which would hold four-fifths of a quart.

Words followed between them, and finally Duty assaulted Coleman with the bottle. Coleman was struck in the chest. Duty again assaulted Coleman with the bottle, and had drawn back to assault him the third time when Kelly, who was then behind Duty, reached up and pulled the bottle from Duty's hand, but Coleman did not know that the bottle had been taken from Duty. After having been struck twice with the bottle, and seeing that Duty was attempting to strike him the third time, Coleman grabbed Duty around

the waist, whereupon Duty hit Coleman in the jaw with his fist and knocked Coleman to the ground. Coleman gained his feet and continued the fight. According to the testimony of the Commonwealth, Duty was retreating and Coleman was in pursuit, reaching for him and striking at him. It is estimated that Duty retreated from twenty to thirty feet before Coleman overtook and knocked him down. After Duty had been knocked down Coleman continued to strike him several licks in the back of the head, whereupon Kelly took Coleman by the arm and led him away. Duty died as a result of the blows received in the back of his head.

Upon the trial, the court submitted the case to the jury upon the charge of murder in the second degree, manslaughter, and excusable homicide. Conviction of murder in the first degree was not requested by the Commonwealth.

There are three assignments of error. The first deals with instructions given and refused. The second challenges the right of the court to have given any instruction on murder for the alleged reason that no malice had been shown. The third is directed to the proposition that the evidence was not sufficient to sustain the verdict.

It is contended by the accused that the highest possible offense of which he could have been convicted was manslaughter. He says that he had no previous grudge against the deceased, that he did not even know him, and that the deceased brought on the entire affray, and he alone was responsible for the result. He also maintains that he had great provocation for his actions which were not actuated by malice either express or implied.

The Commonwealth contends that even if Duty brought on the affray that the accused was willing to fight and that it was mutual combat. It also contends that after Duty knocked the accused down he, Duty, abandoned the fight and ran twenty or thirty feet to get away but in his flight he was pursued and overtaken by the accused who struck Duty in the back of the head either with a bottle or with his fist, knocking him down and afterwards pounding him on the back of the head, from all of which blows Duty died.

We are of the opinion that no malice either express or implied was disclosed by the evidence, and, therefore, a verdict of murder in the second degree is not supported. Without malice there cannot be murder. Generally, express malice appears when there is shown a deliberate intent to unlawfully take the life of another. Implied malice means malice which may be inferred from the circumstances. Here there is an entire absence of evidence which discloses that the accused ever bore any malice or ill will toward Duty or that he ever possessed any intent to kill him.

The Attorney General argues that there were two separate affrays. He contends that the first which had been brought on by Duty ended when Duty knocked the accused down and then proceeded down the sidewalk in a run or trot; that when the accused pursued Duty, striking him from behind, the accused became the aggressor; the circumstances being sufficient to imply malice and render the homicide murder in the second degree.

The difficulty in accepting that argument is found in the fact that a fair and reasonable conclusion to be reached from all of the evidence is that there never was but one fight. There was no separate and distinct altercation at the point where Duty was killed. As expressed by one witness, it was "just a thought" from the time the accused was struck by Duty with the bottle until the accused had knocked Duty down. This witness no doubt meant that the time from the beginning of the fight to the end was of extremely short duration. For two young men to fight over a space of twenty to thirty feet, which after all is only some seven to ten steps, would not be unusual.

Of course, we recognize the principle that one may bring on a difficulty, abandon it in such a manner as to give notice to his adversary of his abandonment, and later, when attacked by his adversary, he may defend himself to the extent of taking his adversary's life, if necessary to protect his own life or to protect himself from great bodily harm.

Total abandonment of an affray by one party who even may have provoked it, with full knowledge of the abandon-

ment by the other, gives to the latter no right to provoke a new and distinct affray. However, simply to retreat a short distance without more, under the circumstances appearing in this case, was not such abandonment as would have exempted Duty from all responsibility in provoking the fight. Even if it be conceded that Duty retreated, no one knows what his reason was for doing so. It may have been for the purpose of placing himself in a more advantageous position to continue hostilities. The evidence fails to disclose that the retreat and continuation of the fight was more than one single, continuous affray.

It must be remembered that the accused did not provoke the fight. He did not seek the encounter, but tried in every reasonable way to avoid it. We cannot say that he willingly engaged in mutual combat. All of the evidence discloses he exhausted all reasonable means to refrain from combat. He tried to explain to Duty that he had not addressed his remarks to him. He suffered Duty to call him a vile name which, as a matter of common knowledge, will ordinarily provoke a fight at almost any time between nearly all men. Duty reiterated the vile name a number of times, applying it to the accused, who exercised great patience under the circumstances, apparently because he realized that Duty was intoxicated. Not until the accused had been twice assaulted with the whiskey bottle, and in order to avoid the third assault, did he lay hold of Duty. Under such circumstances there could have been no inference of malice.

The general rule is that malice may be presumed from proof of killing, when such proof is unaccompanied with circumstances of palliation. The burden of disproving such malice is upon the accused. *Roark* v. *Commonwealth*, 182 Va. 244, 28 S. E. (2d) 693. But in the case at bar the proof of the killing is clearly accompanied with circumstances of great palliation. No reasonable inference of malice could be drawn from the circumstances. Therefore, a verdict of murder in the second degree cannot be sustained. *Thomason* v. *Commonwealth*, 178 Va. 489, 17 S. E. (2d) 374; *Brown* v. *Commonwealth*, 138 Va. 807, 122 S. E. 421, and *Richardson*

v. *Commonwealth*, 128 Va. 691, 104 S. E. 788. In *Wilkins*
v. *Commonwealth*, 176 Va. 580, 11 S. E. (2d) 653, Mr. Jus-
tice Holt quotes as follows from the *Richardson Case*, lan-
guage plainly applicable here:

"'Now in the case before us there was no previous grudge,
the homicide was committed in the course of a sudden quar-
rel, in mutual combat, upon a sudden provocation, which
was unquestionably resented, and the provocation was more
than "very slight". Whether the evidence shows that the
killing was done in justifiable self-defense, it is unnecessary
for us to decide; but it was certainly accompanied with such
circumstances of extenuation that malice, and hence murder,
could not be presumed from the fact of the killing. There
was no other evidence of malice in the case. This being so,
there was no evidence whatever before the jury to support
their verdict of murder in the second degree.'"

The judgment is reversed and the case is remanded to the
court below for a new trial, to be had in accordance with
the views herein expressed.

*Reversed and remanded.*