COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Ortiz and Raphael
Argued by videoconference

SHEREE JOHNETTA FLOOD

                                                 MEMORANDUM OPINION[*] BY
v.       Record No. 0874-21-1                JUDGE STUART A. RAPHAEL
                                                      AUGUST 9, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Rufus A. Banks, Jr., Judge

Trevor Jared Robinson for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Sheree Johnetta Flood appeals her convictions for aggravated malicious wounding (in

violation of Code § 18.2-51.2(A)) and using a firearm in the commission of a felony (in violation

of Code § 18.2-53.1). She argues that the trial court erred by not finding as a matter of law that

she acted in self-defense or in defense of others. We disagree and affirm the judgment.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, ___ (2022) (quoting

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."

*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

On February 14, 2020, Flood shot the victim, Cierra Davis, in the driveway of Davis's home in Chesapeake, after Davis returned from a Valentine's Day concert that she attended with Flood's cousin, Erin Burgess. Davis, Burgess, and Flood offered different versions of the events. We start with Davis's and Burgess's accounts of their trip together to and from the concert.

Davis and Burgess had once been romantically involved. Burgess drove to Davis's house in Chesapeake so the two of them could attend the concert together in Hampton. Davis drove to the concert, with Burgess riding in the passenger seat. Over the course of the evening, Burgess and Davis smoked marijuana and drank alcohol. Davis had a bottle of Hennessy in the car.

Near the end of the concert, Davis and Burgess quarreled. Davis testified that Burgess became angry when another woman sent a text to Davis's phone. When Davis tried to leave the concert, Burgess hit, pushed, and yelled at her, dislodging one of Davis's earrings. Burgess's glasses fell off during the scuffle, and Davis stepped on them. For her part, Burgess testified that Davis became angry because Burgess received a text from a friend whom Davis disliked. Davis then knocked the phone out of Burgess's hand and struck Burgess in the face; Burgess hit Davis back. Burgess testified that her glasses either came off or were knocked off during the incident and that Davis stomped on them.

When they got back to Davis's car, Burgess video-called Flood using "FaceTime." Davis could hear Flood yelling but could not understand what she said. Davis testified that Burgess told Davis, "You going to die tonight." Davis grabbed Burgess's phone and ended the call. She told Burgess that she would give her phone back if Burgess got out of the car. Davis testified that Burgess tried to hit her with the Hennessy bottle, but Davis caught the bottle and put it in the trunk. Burgess said that Davis hit her in the head with the Hennessy bottle, inflicting a concussion.

Davis started to drive home with Burgess in the passenger seat. According to Davis, Burgess grabbed at the steering wheel, so Davis pulled into the parking lot at a Walgreens. After the two argued and Davis refused to return Burgess's phone, Davis resumed driving. But Burgess grabbed the steering wheel again, so Davis stopped in the parking lot of a Sonic. The two continued to argue about Burgess's phone, with Davis refusing to relinquish it unless Burgess got out of the car, and Burgess refusing to get out. Davis eventually drove to her house without further incident.

Burgess, by contrast, testified that she never grabbed the steering wheel. Burgess said that they stopped only once, at either Walgreens or Sonic, because Davis wanted to apologize. Burgess claimed that, when she refused to accept Davis's apology, Davis hit her in the face and then drove home.

What happened after Davis pulled into her driveway is the crux of this case and, again, Davis and Burgess provided substantially different narratives. Davis testified that, as soon as she exited the car, she heard someone say, "Didn't I tell you to stop messing with my cousin?" Davis turned around and saw Flood, armed with a gun and approaching her from across the street. Davis froze at the driver-side door and watched the gun. Flood walked up to the passenger door, put the gun on top of the hood, and opened the passenger door to let Burgess out. Davis put her hands in the air and began walking around the back of her car to get inside the house. She could not walk around the front of the car because it was parked behind her father's car, with no room to pass in between.

As Davis walked around the rear of her car with her hands up, Flood shot at Davis's feet, causing Davis to jump back. Flood then fired a second shot, hitting Davis in the upper torso, just underneath her left armpit. Davis said that, until she was shot, she kept her arms in the air, and she denied making any aggressive moves toward Flood. Davis fell to the ground. As she tried to

get up, Flood pushed her down, saying, "Don't move. You just got a flesh wound." Flood took the gun apart and began pacing back and forth. Paramedics eventually arrived and took Davis to the hospital. Davis testified that the shooting left her paralyzed; she will have to use a wheelchair for the rest of her life.

Burgess provided a different version of events.[1] She testified that, when they arrived at Davis's house, Davis told Burgess that she would not return Burgess's phone unless Burgess came inside. When Burgess refused, Davis put one hand around Burgess's neck and tried to strangle her. With her head arched into the back seat, Burgess used her left foot to honk the horn. Burgess claimed that Davis choked her for a minute or two, stopping when the car horn sounded. Burgess maintained that Davis never struck her, just strangled her.

Burgess said that, about two minutes after Davis stopped choking her, Flood came to the passenger door. Davis exited the car and walked around the rear until she and Flood faced each other, with Burgess in between. She said that Davis and Flood exchanged words, but Burgess did not remember what they said. Davis walked toward Flood, and Burgess believed that she heard two gunshots. Davis fell after the second shot. After the shooting, Flood disassembled her gun and helped Burgess keep Davis awake while calling 911.

Flood provided a third narrative. She testified that she was at a restaurant when she received a "FaceTime" call from Burgess. Flood could not hear what Burgess was saying but could see that Burgess was crying. Flood left the restaurant because "something didn't feel right." She drove to the home of Burgess's mother to see if Burgess was there. When Flood learned that Burgess was with Davis, Flood drove to Davis's house. She parked across the street,

---

[1] Burgess maintained that she did not recall any of the statements she had made to the police. During cross-examination, the Commonwealth played various body-camera recordings of Burgess's statements to refresh her recollection. The video recordings themselves were not entered into evidence and are not part of the record.

hoping only to observe; she planned to leave "if [she] didn't see anything wrong" beyond "just the usual spat."

Flood observed Davis's car pull into the driveway, after which Flood "heard [a] loud commotion and [Burgess] yelling," and then the yelling came "to a complete stop," like Burgess was being "choked." Flood testified that she was on the phone with Burgess's sister at the time. Flood told Burgess's sister to call the police because Davis was choking Burgess. Flood then ran to the car with her gun in her pocket and saw Davis and Burgess "fistfighting" in the front seat. She heard the car horn sound while running across the street, and it sounded again once she reached Davis's car. Flood opened the passenger door and pulled Burgess out of the car.

Flood said that, as she walked back to her own car, Burgess yelled "stop." Flood turned around to see Davis getting out of the car and coming toward Flood. Flood did not recall if Davis said anything. Flood admitted on cross-examination that, at that point, "ain't nobody a threat." Flood said she was standing on the sidewalk, about "8 to 10 feet" from Davis's vehicle, and Davis was about twenty-one feet away from Flood, walking toward her.[2] Flood told Davis to stop, pulled out her gun, and fired a warning shot into the air. Davis kept approaching with her right arm behind her back and her left arm at her side. When Davis was about twelve feet away, Flood fired another shot at Davis's feet to stop her. When Davis continued approaching, Flood fired a third shot from seven-and-a-half feet away, aiming for Davis's left shoulder. Flood said she knew that Davis sometimes carried a weapon, that she thought Davis had a weapon at the time, and that she felt she was in danger. Flood admitted that she could not see any gun. Flood called the police, disassembled the pistol, and put it on the ground.

---

[2] While estimating distances, Flood's counsel held one end of a tape measure while Flood held the other end.

City of Chesapeake Police Officer Chad Susanke testified that Davis received one gunshot wound "under her left arm, near her armpit." He observed two spent shell casings, one cartridge, and the firearm lying in the street. The Commonwealth also introduced a certificate of analysis for the pistol (a 9-mm Luger), three 9-mm Luger cartridge cases, and one cartridge. In the Commonwealth's rebuttal case, Davis's father testified that he was sleeping inside the house when he heard two gunshots. He denied hearing the car horn or any fighting or screaming.

The trial court denied Flood's motion to strike and renewed motion to strike. Flood argued in closing that Davis's testimony was not credible and that Flood acted reasonably in self-defense and in defense of Burgess.

The trial court found Flood guilty of aggravated malicious wounding and of using a firearm in the commission of a felony. The court said that it "considered all of the evidence" and "the credibility" of the witness testimony. The court reasoned that Davis was shot under her left armpit, consistent with her testimony that she held her arms in the air and inconsistent with Flood's testimony that Davis held her left arm down at her side. Flood moved to set aside the verdict, arguing that the certificate of analysis showed that police recovered and tested three cartridge cases, supporting Flood's testimony that she fired three shots. The trial court denied Flood's motion. Flood was sentenced to twenty years' incarceration with thirteen years suspended for aggravated malicious wounding. She also received the mandatory minimum sentence of three years' incarceration for using a firearm in commission of a felony.

## ANALYSIS

Flood argues that the trial court erred in denying her renewed motion to strike and her motion to set aside the verdict. Because both assignments of error challenge the trial court's rejection of Flood's self-defense and defense-of-others claims, we address both assignments of error together.

A defendant is guilty of malicious wounding when she "maliciously shoot[s], stab[s], cut[s], or wound[s] any person or by any means cause[s] [her] bodily injury, with the intent to maim, disfigure, disable, or kill." Code § 18.2-51. If "the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment," the defendant is guilty of aggravated malicious wounding. Code § 18.2-51.2(A). Malice can be inferred when the defendant uses a deadly weapon such as a firearm. *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012). A defendant who uses a firearm to commit malicious wounding also violates Code § 18.2-53.1, prohibiting the use of a firearm in the commission of a felony.

Flood does not assert that the Commonwealth failed to prove these elements, only that Flood's actions were justified based on self-defense or the defense of others. To prevail on such a defense, the accused must adduce "sufficient evidence to raise a reasonable doubt about [her] guilt." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)); *see also Foster v. Commonwealth*, 13 Va. App. 380, 383-85 (1991) (defense of others). "Whether an individual establishes that [s]he acted in self-defense is 'an issue of fact.'" *Commonwealth v. Needham*, 55 Va. App. 316, 326 (2009) (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 979 (1977)). "The trier of fact determines the weight of evidence in support of a claim of self-defense." *Id.* (quoting *Gardner v. Commonwealth*, 3 Va. App. 418, 426 (1986)).

To prove self-defense, the defendant must prove that she acted in reasonable apprehension of bodily harm and that the force she used was "reasonably proportioned to the perceived threat." *See Caison v. Commonwealth*, 52 Va. App. 423, 440 (2008); *see also, e.g.*, *Diffendal v. Commonwealth*, 8 Va. App. 417, 421 (1989) (same). A reasonable apprehension of bodily harm requires "some act menacing present peril . . . [and] [t]he act . . . must be of such a character as to afford a reasonable ground for believing there is a design . . . to do some serious

- 7 -

bodily harm, and imminent danger of carrying such design into immediate execution." *Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (alterations in original) (quoting *Byrd v. Commonwealth*, 89 Va. 536, 539 (1893)). Similarly, when the defendant has used deadly force to defend another, the defense is available only where the defendant "reasonably believes that the person defended faces an imminent threat of serious bodily harm or death and that such person was not at fault in bringing about the necessity to use the deadly force." *Lynn v. Commonwealth*, 27 Va. App. 336, 353 (1998), *aff'd*, 257 Va. 239 (1999); *see also Foster*, 13 Va. App. at 386. "[A]n individual's right to self-defend 'begins where the necessity begins and ends where it ends,'" *Caison*, 52 Va. App. at 440 (quoting *Thomason v. Commonwealth*, 178 Va. 489, 498 (1941)), and "the right to defend another 'is commensurate with self-defense,'" *Foster*, 13 Va. App. at 385 (quoting 40 Am. Jur. 2d *Homicide* § 171 (1968)).

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). "We also presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the

prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019).

"[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

The trial court heard three different versions of events from Davis, Burgess, and Flood, and it was the trial court's prerogative to determine which version was credible. Davis testified that she was walking toward her front door with her hands in the air when Flood shot her. If believed, such testimony negates Flood's claim that she shot Davis in self-defense or to protect Burgess. The trial court believed Davis's testimony because Davis's injury—to the upper torso just below her left armpit—was more consistent with Davis's testimony that she walked with her hands up than with Flood's testimony that Davis kept her left arm by her side. Because Davis's testimony was not inherently incredible, the trial court could properly believe Davis and disbelieve Flood's self-serving testimony to the contrary.

Flood argues that the certificate of analysis supports her testimony because it shows that three cartridge cases were recovered from the scene, thus corroborating Flood's testimony that she fired three shots, not two. While corroborative of one aspect of Flood's testimony, however, it does not render Davis's testimony inherently incredible. For one thing, the number of shots fired at Davis was less important to the trial judge than Davis's testimony that she held her arms

in the air. That fact was consistent with the bullet wound to Davis's left armpit and inconsistent with Flood's testimony that Davis's left arm was down when she shot her. Davis may have been mistaken about how many shots Flood fired and still be correct about the critical aspects of the incident, such as whether she had her arms up when Flood shot her.[3]

Flood is wrong that Davis's testimony could not be found credible because it was contradicted by Burgess's testimony. A conflict between the testimony of different witnesses is up to the fact finder to resolve. The trial court considered witness credibility and found Davis more credible than Burgess, whose testimony at times also contradicted Flood's version of events. For example, Flood testified that she arrived at Davis's car as Davis was choking and hitting Burgess. But Burgess testified that Davis had stopped choking her a couple minutes before Flood arrived and that Davis did not strike her. Flood also testified that, at the time of the shooting, she was standing on the sidewalk behind the car facing toward the house, while Davis was facing the street. Burgess testified, however, that Flood was standing to the side of the car facing away from the house while Davis was near the back of the car facing toward the house, a detail consistent with Davis's testimony. Confronted with those three conflicting versions of events, the fact finder could select the narrative that it found most credible.

Even if the trial court accepted Flood's version of events and rejected Davis's version, the fact finder could properly reject Flood's self-defense and defense-of-others claims. Flood testified that, after the choking ended, she began walking back to her car because, at that point, "ain't nobody a threat." *See Caison*, 52 Va. App. at 440 ("[A]n individual's right to self-defend 'begins where the necessity begins and ends where it ends.'" (quoting *Thomason*, 178 Va. at

---

[3] Davis's father and Burgess both testified that they heard only two shots, and Susanke testified that he recovered two cartridge cases, corroborating Davis' testimony in this regard, while the certificate of analysis tended to support Flood's version. In other words, there was a clear factual dispute that the fact finder had to resolve.

498)).  Nor could Flood base her defense-of-others claim on the earlier altercations between Davis and Burgess, which were unknown to Flood when she shot Davis.  *See Hines v. Commonwealth*, 292 Va. 674, 679 (2016) ("Whether the danger is reasonably apparent is judged from the viewpoint of the defendant at the time of the incident.").  Flood's only basis for her defense was her flawed speculation that Davis might have been armed, combined with Davis's walking toward her with her right hand behind her back.  A reasonable fact finder could permissibly conclude that Davis's act of walking in Flood's direction did not rise to the level of a "menacing present peril," *Byrd*, 89 Va. at 539, that could justify shooting Davis.

## CONCLUSION

In short, we find no error in the trial court's decision to reject Flood's defense that she shot Davis in self-defense or to protect Burgess.

*Affirmed.*