# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## Melvin W. Adams v. Commonwealth.

### January 17, 1935.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*Paul H. Coleman,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

Melvin W. Adams was indicted in the Corporation Court of the city of Lynchburg for the murder of Archie Leebrick. Upon this indictment he was tried and found guilty of murder in the second degree and was sentenced to confinement in the penitentiary for a period of eight years.

In the petition for a writ of error the accused relies upon the plea of self-defense and complains of the action of the trial court in refusing to set aside the verdict of the jury, on the ground that the same was contrary to the law and the evidence.

It is conceded by counsel for the accused that the verdict of the jury approved by the trial court settles all material conflicts in the evidence in favor of the Commonwealth. The pivotal question, therefore, is: Does the evidence adduced by the Commonwealth sustain a verdict of murder in the second degree?

In *Gray's Case,* 92 Va. 772, 22 S. E. 858, Judge Riely approved the following instruction defining murder in the second degree: "If the jury believe from the evidence that the killing aforesaid was malicious, but not wilful, deliberate, and premeditated, then such killing was murder in the second degree."

On a charge of murder, malice is presumed from the fact of killing, and "when the Commonwealth has proven the commission of a homicide, and has pointed out the accused as the criminal agent, then it may rest its case, and, unless the accused shows circumstances of justification, excuse, or alleviation, a verdict of murder in the second degree will be warranted." *Mercer's Case,* 150 Va. 594, 142 S. E. 369, 370.

The homicide was committed on August 13, 1933. The

salient facts which constitute the case of the Common-
wealth may be summarized thus: The accused was re-
quested by a young woman acquaintance whom he met on
the main street of the city of Lynchburg, at 10:30 P. M.,
to take her home. He consented to take her home in his
car, provided she would first go with him to the home of a
Mr. Elliott who lived on 116 Withers street, as he wished to
see Elliott in regard to a position he thought he might ob-
tain.

When they arrived at the Elliott home they found, in ad-
dition to Mr. and Mrs. Elliott, a man named Wilkerson, and
Page Staton. Staton became obnoxious by reason of his
intoxicated condition, and Mrs. Elliott called the police to
have him ejected. Staton was a friend of Leebrick and they
had been on a protracted drunk since the Friday afternoon
prior to the homicide. When the officer arrived at the
Elliott home he was persuaded by Leebrick and other
friends of Staton, who had arrived in the meantime, to
turn Staton over to them. This was done and he was taken
by them to the home of Dora Smith who lived in the ad-
joining house.

After the officer left, accused was invited by John Collins,
a friend of Leebrick, to repair to the Smith home to have a
drink of liquor. When he arrived at the Smith home he
found Leebrick and several companions with the liquor
in the kitchen. Accused asked Collins if the girl could have
a drink. Collins answered in the affirmative and accused
went back to the Elliott home and returned with the girl.
Leebrick, who concededly was in a drunken condition, at-
tempted to put his arm around her. She objected to his
embraces and the accused remonstrated and stated that the
girl was with him, whereupon Leebrick told accused if the
girl was with him that he could get her whiskey, and picked
up Collins' whiskey and went to the home of Bertha Ray
who lived in the same locality. When Leebrick arrived at
the Ray home he put the liquor on a table in the kitchen and
then laid down on a bed.

In a short time the accused appeared at the Ray home

with the girl. Within a few minutes after their arrival dancing and singing were indulged in by accused, Mrs. Elliott, Collins and others. Leebrick, from his place on the bed, made the remark, "You sons of bitches certainly can sing." The accused, who was dancing with Mrs. Elliott, was the only one who took exception to the remark. He stopped dancing and he and Leebrick began to curse each other. Accused then said to Leebrick, "Get on your feet and say that." The accused then invited Leebrick to go outside, saying, "We'll go in the street and settle it." The accused and several others then went out into the street. At the time accused invited Leebrick to go outside and "settle it," according to the testimony of Bertha Ray, he had a closed knife in his hand and Leebrick was advised by the Ray woman not to go outside. When Leebrick in his drunken condition finally arrived in the street, Staton attempted, by holding him, to keep the parties from fighting, but when they persisted in their efforts to fight, he released them. Leebrick struck the accused in the face a blow which staggered him; then the parties clinched and accused, who was in his shirt sleeves, began striking Leebrick around the body. Shortly thereafter Leebrick fell to the ground exclaiming, "He has stabbed me." Leebrick was stabbed or cut eight times.

The accused left the scene and went to the Elliott home where Mrs. Elliott put iodine on a place on his arm which he stated was a knife wound inflicted by Leebrick, but which, according to the testimony of the police officer who arrested him, looked more like a scratch than a knife wound, and which did not penetrate to the soft part of the arm. The doctor who examined the arm, testifying as a witness for the defense, described it as more than a scratch, saying that it could have been made by a finger nail and did not need sewing up. During the fight the accused had his sleeves rolled up and the alleged wound on the arm was the only indication of the use of a weapon. No knife was found upon Leebrick nor upon the ground where the fight occurred. No one saw Leebrick use a knife. The accused admitted

the wounding, but claimed that he acted in self-defense; that Leebrick had previously threatened him with injury; and that he was scared and excited.

█ There is not the semblance of a doubt that accused, smarting under the epithet applied to all those who were engaged in the singing in the Ray home, extended to Leebrick an invitation to engage in combat. If the statement of Bertha Ray is true, and the jury has said it is true, the accused was armed with a knife when he invited Leebrick to fight. Counsel argue with earnestness that Leebrick was the aggressor, as he struck the first blow, but counsel overlook the fact that the invitation to engage in combat came from the accused. When one extends an invitation to another to engage him in combat, it may be assumed that if the invitation is accepted it will be accompanied with a blow. Vile as the epithet was that Leebrick employed, it afforded no legal excuse to the accused to assault him and was not in law such a provocation as justified the killing.

█ One will not be permitted to invite another to commit a common assault upon him and then justify a repellent assault on the ground of self-defense. It has been determined by the jury that the assault committed by Leebrick with his fist was a common assault, as it is known in law.

█ In view of the evidence of the Commonwealth that Leebrick did not have a knife, the jury did not have to accept the statement of the accused that Leebrick cut him, and were warranted in the inference that if a wound did exist, it was self-inflicted. In our opinion the verdict of murder in the second degree was warranted by the evidence, and unless error was committed by the trial court in giving and refusing instructions, as contended by accused, the judgment should be affirmed.

Seventeen instructions were given by the court—nine for the Commonwealth and eight for the accused. In our opinion it is only necessary to consider Instructions 1 and 4, given on motion of counsel for the Commonwealth:

"(1) The court instructs the jury that murder in the first degree is any wilful, deliberate and premeditated kill-

ing of one human being by another with malice; murder in the second degree is such killing with malice but without being wilful, deliberate and premeditated.

"Voluntary manslaughter is killing in the heat of sudden passion upon reasonable provocation or in mutual combat."

"(4) The court instructs the jury that where a homicide with a deadly weapon is proved malice is implied and the presumption in this Commonwealth is that it is murder in the second degree; and the burden of proof is upon the Commonwealth to show that the killing was wilful, deliberate and premeditated and is, therefore, murder in the first degree and upon the accused to show that it was without malice and is, therefore, only manslaughter or that he acted lawfully and is, therefore, not guilty."

■ The first contention is that the instructions were inapplicable, for the reason that the presumption of malice to constitute the homicide murder does not as a matter of law apply.

In *Mercer* v. *Commonwealth*, 150 Va. 588, 142 S. E. 369, 370, is to be found the answer of this court to the contention of counsel. In that case we read: "At the instance of the Commonwealth, and over the objection of the accused, the court gave this instruction:

" 'Every unlawful homicide in Virginia is presumed in law to be murder in the second degree. In order to elevate the offense to murder in the first degree, the burden of proof is on the Commonwealth, to reduce the offense to manslaughter, the burden of proof is on the prisoner.'

"This action of the court is assigned as error. The main objection urged to this instruction is that it tells the jury that malice is an inference of law drawn from the act of killing, and not an ingredient of fact which requires proof of its existence.

"(1) Murder, in Virginia, is either murder in the first degree or murder in the second degree. This distinction is statutory.

"Section 4393 of the Code is as follows: 'Murder by poison, lying in wait, imprisonment, starving, or by any

wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit arson, rape, robbery, or burglary, is murder of the first degree. All other murder is murder of the second degree.'

"(2) To constitute murder, either at common law or under the statute, malice is an essential constituent. Malice may be either express or implied.

"In *Murphy* v. *Commonwealth,* 23 Gratt. (64 Va.) 960, decided in March, 1873, the following instruction was made the basis of an assignment of error: 'The court further instructs the jury, that the law is that malice may be implied from the deliberate use of a deadly weapon in the absence of proof to the contrary.' Judge Moncure, delivering the opinion of the court, held that the instruction correctly expounds the law.

"(3) In Exposition of the Law of Crimes and Punishments, page 55, Professor John B. Minor states the doctrine thus: 'Malice is a *prima facie* inference from the very fact, for one must be presumed to have designed to do what he did, or what is the immediate and necessary consequence of his act, unless he can show the contrary.'

"This doctrine has been adhered to in *Lewis' Case,* 78 Va. 733; *Honesty's Case,* 81 Va. 291; *Muscoe's Case,* 86 Va. 451, 10 S. E. 534; *Horton's Case,* 99 Va. 853, 38 S. E. 184; *Potts' Case,* 113 Va. 733, 73 S. E. 470; and in *Sims' Case* (1922), 134 Va. 736, 115 S. E. 382. In the latter case the trial court instructed the jury that 'every homicide is presumed to be murder in the second degree and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth, but on the other hand, in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide, the burden is upon the prisoner.'

"In holding that the instruction correctly states the law, Judge Burks said: 'Two objections were made to this instruction. The first is that so much of the instruction as states that "in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide,

the burden is upon the prisoner," is not a correct statement of the law. This statement of the law is hoary with age and has been followed without criticism or objection in this jurisdiction for nearly a century. A partial list of the cases in which it has been approved is given in the margin. If in its practical application it had proved unfair or injurious to persons accused of homicide, it is more than probable that the fact would long ago have been discovered by the bar and the bench. It has proven satisfactory in the administration of justice and not hurtful to those accused of homicide, and we have no disposition to depart from it.'

"(4-6) While we are of the opinion that this assignment is without merit, we are not unmindful of the strong argument advanced in the dissenting opinion of Wilde, J., in *Commonwealth* v. *York,* 9 Metcalf (Mass.) 93, 43 Am. Dec. 373, cited by counsel for the accused. In *Litton's Case,* 101 Va. 833, 44 S. E. 923, however, it is held that when the Commonwealth has proven the commission of a homicide and has pointed out the accused as the criminal agent, then it may rest its case, and unless the accused shows circumstances of justification, excuse, or alleviation, a verdict of murder in the second degree will be warranted."

█ The second contention is that instruction four implies the use of a deadly weapon when, as a matter of fact, an ordinary pocket knife is not such a deadly weapon as is contemplated by the law; that the phrase "in the previous possession of the slayer" means a possession of the weapon acquired for the purpose for which it was used. There is no merit in the contention.

In *Mealy* v. *Commonwealth,* 135 Va. 588, 115 S. E. 528, 529, this court was confronted with a similar proposition. It appears in that case that an altercation occurred between the accused and her husband. Her claim was that her husband beat and choked her because she had opened a letter addressed to him and written by a woman named Cook. Breaking loose from him, she ran into an adjoining room, secured a gun, came back into the room where her husband

was and shot him. Over the objection of counsel for the accused, the court gave this instruction:

"The court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation or even with slight provocation is *prima facie* wilful, deliberate and premeditated killing and throws upon the prisoner the necessity of showing extenuating circumstances."

Judge Kelly, in delivering the unanimous opinion of the court, said: "The objection urged to this instruction is twofold. It is said, in the first place, that the possesison of the gun by the defendant was not such 'previous possession' as was legally requisite in order to make the instruction applicable. To sustain this contention we would have to overrule a long line of Virginia decisions, too numerous and familiar to require citation here.

"The rule applied in this instruction has its foundation in the principle of criminal law that every person is presumed to have intended the natural and probable consequences of his voluntary acts. The test of the criminal intent in the use of a deadly weapon is to be found, not in the manner in which or the purpose for which the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose. For example, in *Honesty's Case*, 81 Va. 283, 295, 296, the accused struck the fatal blow with a brickbat which he had but a moment before picked up, and in *Jones' Case*, 100 Va. 842, 855, 41 S. E. 951, the prisoner killed his victim with a post hole digger which he had in his hand before and at the time the altercation began, and with which he was peacefully prosecuting the work of building a fence. In both of these cases it was contended, with respect to an instruction exactly like the one here complained of, that the 'previous possession' necessary to justify such an instruction must be understood as a possession originating in previous preparation for the crime; but in both cases this court rejected that contention."

There is no error in the judgment of the trial court and it will be affirmed.

*Affirmed.*

EPES and BROWNING, JJ., dissenting.

EPES, J., dissenting.

I might take refuge behind the curtain of precedent and avoid this dissent. But I have been convinced that, regardless of what may have been my former opinion and the fact that the instruction is "hoary with age," instruction number four is basically wrong, and I would not be mentally honest in concurring in the opinion of the court without at least disclosing that I have become convinced that the instruction is wrong and should not have been given.

The instruction is unquestionably supported by precedent in Virginia and has been approved by a long line of judges for whose legal learning and ability I have high regard, and the trial court in giving it was following (as it should have done) the precedent laid down by this court; but, in my judgment, it is not sustainable on principle, and a new trial should be granted the accused because it was given.

In *Sims' Case* (1922), 134 Va. 736, 115 S. E. 382, 387, from which the court in its opinion quotes at length, Judge Burks can hardly be said to have attempted to justify it upon principle. He rather contents himself with an apology for it on the ground that it has been said that it is "hoary with age," and that in practical application "it has proven satisfactory in the administration of justice and not hurtful to those accused of homicide."

This observation may be correct. But, if so, may it not be indicative that, despite such an instruction, juries not infrequently have had the intuitive good sense to apply the sounder principle that, if upon the whole evidence the jury entertains a reasonable doubt as to whether the killing was done with malice, it should acquit the accused of murder, rather than indicative that the instruction states a correct rule of law?

Due to the fact that the Commonwealth has not the right of appeal, cases which reflect such action on the part of juries are not often found in the reports of appellate courts; but, I am convinced they will be found if the trials in which the accused is acquitted or found guilty of manslaughter are carefully studied.

Upon principle, I see no escape from the conclusions reached and so well stated by Wilde, J., in his dissenting opinion in *Com.* v. *York,* 9 Metc. (Mass.) 93, at p. 125, *et seq.,* 43 Am. Dec. 373. With him I. say, I am of opinion:

"1. That when the facts and circumstances accompanying a homicide are given in evidence, the question whether the crime is murder (*i. e.,* the killing was done with malice) or manslaughter is to be decided upon the evidence, and not upon any presumption (of law) from the mere act of killing. 2. That if there be any such presumption, it is a presumption of fact, and if the evidence leads to a reasonable doubt whether the presumption be well founded, that doubt will avail in favor of the prisoner (*i. e.,* accused). 3. That the burden of proof, in every criminal case, is on the Commonwealth to prove all the material allegations in the indictment; and if, on the whole evidence, the jury have a reasonable doubt whether the defendant is guilty of the crime charged, they are bound to acquit him." (Words in parentheses mine.)

I commend Judge Wilde's opinion to the careful consideration and analysis of anyone interested in this subject, though even he at times used the word "implied" where he plainly means "inferred."

If an instruction such as number four is given, it should be accompanied by one reading substantially as follows: "If upon a consideration of all the evidence you have a reasonable doubt whether the killing was done with malice or not, you should not find him guilty of murder."

There was sufficient evidence in this case to warrant an inference by the jury that this killing was done with malice; but, in my judgment, there was no justification for the im-

putation of malice to the accused as a matter of law, *i. e.*, for a legal presumption of malice.

Perhaps the jury, drawing its own inferences, would have found that the evidence convinced it beyond a reasonable doubt that the accused killed the deceased with malice aforethought, even if it had not been told, in effect, that the law imputed malice to him from the mere fact of the killing and required him to disprove the existence of it; but I cannot say, as a matter of law, that it would have done so.

Having performed the duty of registering my dissent on principle, I shall hereafter accept without comment the precedents on this point as controlling so long as a majority of the court is of opinion they should be adhered to.