# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

THOMAS R. MITCHELL v. COMMONWEALTH OF VIRGINIA.

November 24, 1941.

Record No. 2429.

Present, All the Justices.

The opinion states the case.

*R. I. Overbey,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

Thomas R. Mitchell was indicted in the Circuit Court of Campbell county for the murder of R. W. DePriest, Jr. Upon that indictment he was arraigned, and upon his plea of not guilty, he was tried by a jury, which found him guilty of voluntary manslaughter and fixed his punishment at five years in the penitentiary.

The verdict of the jury was carried into execution by the sentence of the court, and accused is here upon a writ of error which challenges the validity of the judgment.

In the trial of the case, the defendant, to sustain his plea of not guilty, relied upon the plea of self-defense, and he now contends that the verdict of the jury is contrary to the law and the evidence. The evidence of the Commonwealth and of the defendant is in hopeless conflict.

In *Adams* v. *Commonwealth*, 163 Va. 1053, 178 S. E. 29, this court said:

■ "The verdict of the jury approved by the trial court settles all material conflicts in the evidence in favor of the Commonwealth."

The question thus presented is: Does the evidence of the Commonwealth sustain the verdict of voluntary manslaughter?

The salient facts upon which the Commonwealth relies to sustain the verdict and judgment may be summarized as follows:

The deceased, Robert W. DePriest, Jr., resided upon his farm in Campbell county, with his wife and child, an unmarried daughter. It was his custom on each Saturday to market his farm produce, including dressed poultry, in the city of Lynchburg. During the week which ended August 17, 1940, it had been agreed that Annie D. Lindsay, a daughter of the deceased, should bring some chickens to the DePriest home on Friday, for the purpose of marketing them on Saturday. In accordance with this agreement, Annie Lindsay and her husband, George Lindsay, arrived at the DePriest home on Friday. They were accompanied by John Goodman and by Harvey Mitchell who was a brother of the defendant and owned the car in which they drove to the DePriest home. Upon their arrival at the home, about 3 o'clock in the afternoon, they found the deceased, his wife, Katie L. DePriest, his daughter, Nancy, and a young man named Wesley Kerr. There was evidence to the effect that Mrs. DePriest, the Lindsays, Harvey Mitchell and Goodman drank some wine during the afternoon, but it was denied that they drank to excess.

At approximately seven o'clock P. M., the defendant, accompanied by his two little boys and one "Hop" Elliott, arrived in his automobile at the DePriest home.

The defendant, who was a nephew of Mrs. DePriest, stated upon his arrival at the home that he came to get the car of his brother Harvey, to prevent one John Mitchell from taking it into possession for a debt due him. When he requested that Harvey give him the keys to the car, he was informed that George Lindsay had the keys. Thereupon, he requested Lindsay to turn the keys over to him, but Lindsay refused to do so, because he said Harvey had promised to take him and his wife back to their home. Upon Lindsay's refusal to surrender the keys, the defendant and Lindsay became involved in a fist fight, during which Mrs. Lindsay, who attempted to separate them, was accidentally struck by defendant. The fight continued until Robert DePriest (the deceased) separated Lindsay and the defendant, and said to defendant: "Tom, if that is what you came here for, to raise a row and disturbance, you get away and stay away."

Without calling for Elliott, who came with him, defendant got into his car and drove away. In approximately half an hour after his departure he came back to the DePriest home, alone, having left the two little boys at his home.

According to the evidence of Lindsay, which the jury accepted as true, this then occurred:

"Tom Mitchell's car drove up and turned around and he left the lights on and left the motor running. I didn't even know who it was. I wasn't thinking about Tom coming back, so I was standing on the porch and he walked right up to me and throwed a gun on me—said, 'Do you believe I will shoot the blue hell out of you?' I said, 'No, Tom, I don't. I haven't done anything to you to shoot me for.' He said, 'If you come off the porch I will kill you.' So I stepped off the porch and he kept backing back and kept telling me 'If you come any fur-

ther I am going to shoot you.' He said it five or six times, and I kept following him. When he got up to the rear end of his car he stopped. I reckon I was within five or six feet of him. Mr. DePriest came around and said, 'Tom, ain't I told you to get away from here and stay away from here?' He no more than got it out of his mouth than Tom shot him. He missed him the first time and Mr. DePriest kind of grabbed at him and he fired the second time.

"Q. What did Tom do?

"A. Jumped in his automobile and left.

"Q. Did he ever bend over and look at him?

"A. As soon as the second shot was fired he left.

"Q. Did he leave slow or fast?

"A. Well, I reached for Mr. DePriest and before I could raise him the car was turning in the road down there."

In addition to the parol evidence the Commonwealth, over the objection of defendant, introduced the dying declaration of DePriest which is as follows:

"Statement of R. W. DePriest, Jr. August 17, 1940. Age 50 years. Residence—Campbell County, west of Winfall. States that he was shot by Tom Mitchell of Campbell County about 8 to 9 o'clock.

" 'Tom came up home fussing, and hit my daughter. This made me mad and I grabbed him in the collar but did not hit him. He then got into his car and left. Then he came back and was fussing around with George Lindsay. I did not hear this. I went out to where he was. He said for me not to come to him. When I kept coming and he backed up a ways I did not see the gun in his hand, as it was dark, but I seen the flash of the gun when it was fired. I had a knife in my hand when the first time Mitchell was there but it was not opened. But what he came back the second time I never taken my knife out of my pocket. The reason I was going to him was that I wanted to apologize for what had happened when he was at the house the first time. After I was

shot Tom Mitchell jumped into his car and left. That is all I remember.'

"I make this statement knowing that I am in a dying condition and that I will not survive, with the full knowledge of my condition." Signed by his mark and witnessed by C. O. Deaner and D. S. Withers.

6/17/40, 2:00 P. M."

The Commonwealth also introduced J. L. Miles, the sheriff of Campbell county, who testified as follows:

"Q. Now, will you tell the jury and the court what Mr. DePriest told you at that time?

"A. Well, he told me the night he got shot that Harvey Mitchell and several other youngsters were there at his house, and later Tom Mitchell came over and Tom Mitchell and his son-in-law, Mr. Lindsay, got in an argument, and he went out and told Tom that he didn't want any argument or fuss or disturbance around his home and if he couldn't do any better than that he would have to leave. He said that Tom got in his car and left and was gone he reckoned around thirty minutes. He came back, parked his car about the same place, and left the lights on and left the motor running and he and Lindsay, his son-in-law, got in an argument again and were arguing, and he went out there and took Tom by the arm and says, 'Tom, I want you to get in your car and leave. I am not going to have this around here' and said Tom shot him."

In conformity with the evidence adduced by the Commonwealth, which the jury accepted as true, we are of opinion that the Commonwealth has borne the burden imposed upon it by law.

The jury was fully warranted in drawing the legal inference, from the facts and circumstances of the case as presented by the Commonwealth, that the defendant, smarting under the refusal of Lindsay to deliver him the car keys, smarting under the assault upon him by Lindsay and smarting under the command of DePriest to leave his premises, went to his home, armed himself

with a pistol and returned to the DePriest home to wreak vengeance upon either Lindsay or DePriest.

In our opinion, if the jury had found the defendant guilty of murder, the verdict could not have been disturbed as contrary to the evidence. Be that as it may, the jury in the exercise of its power has found the defendant guilty of manslaughter and unless the trial court has committed error in admitting illegal evidence, and in giving and refusing instructions, the judgment must be affirmed.

It is assigned as error that the court admitted in evidence two declarations alleged to be dying declarations of R. W. DePriest.

The admissibility of these declarations is challenged on two grounds: First, the deceased was under the influence of opiates when the declarations were made, and hence, was irrational; second, there was no evidence to the effect that the declarant was conscious of impending death.

The evidence of Dr. H. H. Hurt, the physician who attended R. W. DePriest at the Lynchburg Memorial Hospital, was a complete refutation of the claim that at the time the declarations were made the deceased was either irrational or was unconscious of impending death. Dr. Hurt testified as follows:

"Q. Dr. Hurt, did you, at the request of the Commonwealth Attorney, advise Mr. DePriest of his condition about 2:00 o'clock on the afternoon of the 17th?

"A. I did.

"Q. Will you please state to the jury just what you told Mr. DePriest?

"A. I told Mr. DePriest that I did not think he would get well.

"Q. What reply, if any, did Mr. DePriest make to you.

"A. He said he didn't think he would either.

"Q. Do you think at that time that Dr. DePriest was rational and knew what he was talking about?

"A. Yes, sir.

"Q. In your opinion, do you think at that time that Mr. DePriest believed he was going to die?

"A. Yes, sir, he told me so."

To the same effect was the evidence of the Commonwealth Attorney, the sheriff and the attending nurse.

■ It is further contended, however, that because the written declaration was in the handwriting of two persons and signed by mark, it was inadmissible. There is no merit in this contention.

A similar contention was made in *Evans* v. *Commonwealth,* 161 Va. 992, 170 S. E. 756. The contention was held to be untenable, Mr. Justice Holt saying:

"This declaration, though not signed by Henry Yates, was read to him and approved by him.

■ "A man who believes that he is in immediate presence of death may make one or more dying statements. If made at different times all of them may be admitted in evidence, even though they contradict each other. Contradictions are for the jury. But when a statement is reduced to writing and signed by the declarant or is read over to him and assented to by him it is the best evidence as to what was then said."

It is assigned as error that the court erred in refusing instructions offered by the defendant and in giving instructions offered by the Commonwealth, over the objection of defendant.

Instructions M and N, offered by defendant and refused, are as follows:

M. "The court further instructs the jury in this case that as a matter of law, they are entitled to consider the declarations of the deceased in the light of all the evidence in this case, the absence of opportunity for cross-examination of the mental condition of the declarant, and all the circumstances under which they were made."

N. "The court further instructs the jury that the law does not regard the declarations of the deceased, R. W. DePriest, as of the same weight and value as the testimony of a witness given in open court under the safe-

guards provided for the discovery of the truth; that the testimony of the witness, where he is seen, heard, and cross-examined, is of greater weight than the statements of a dying man, whose condition the jury could not observe and whose statement was not subjected to the corrective and explanatory test of cross-examination.''

In *Evans* v. *Commonwealth, supra,* the court, over the objection of the accused, gave this instruction:

. ''* * * that dying declarations, when deliberately made under the solemn sense of impending dissolution and concerning circumstances in respect of which the deceased was not likely to have been mistaken, are entitled to as great weight, if precisely identified, as if the deceased had been living and sworn in court and had testified the same as said dying declaration.''

In holding that the giving of the instruction was error, this is said:

■ ''The weight of this evidence was for the jury and in weighing it the circumstances in which the statements were made should have been considered. Since its weight was for the jury, the court should not have given them any specific instruction on that phase of that subject. They are taken as if made under oath and that is all. *Swisher* v. *Commonwealth,* 26 Gratt. (67 Va.) 964, 21 Am. Dec. 330; *O'Boyle's Case, supra* [100 Va. 785, 40 S. E. 121]; *Pendleton* v. *Commonwealth,* 131 Va. 676, 109 S. E. 201.''

■ There is no merit in this assignment of error.

The record displays twenty-one instructions given the jury in this case. Seven were for the Commonwealth and fourteen for the defendant.

■ We have carefully examined these twenty-one instructions and reached the conclusion that there was not a phase of the case which is not covered by them. To enter upon a *seriatim* discussion of the instructions granted and refused would be an assumption of a burden which the law does not impose.

It may be conceded that some of the instructions may not be letter perfect. A careful analysis demonstrates that they protect every legal right of the defendant.

We find no error in the judgment of the trial court and it is, therefore, affirmed.

*Affirmed.*