COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Fulton and White

CHRISTOPHER NICHOLAS BOISSEAU

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0073-24-2              JUDGE KIMBERLEY SLAYTON WHITE
                                                        AUGUST 5, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

(Russell N. Allen, on brief), for appellant. Appellant submitting on
brief.

(Jason S. Miyares, Attorney General; Jessica M. Bradley, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Christopher Nicholas Boisseau of

second-degree murder and using a firearm while committing murder. On appeal, he alleges the trial

court erred in not giving a jury instruction on justifiable self-defense. He also alleges the trial court

erred in not granting his "motion to dismiss all charges" based on the affirmative defense of

self-defense and the claim of insufficient evidence of malice. Finding the first assignment of error

has no merit and Boisseau has waived the second, we affirm both convictions.[1]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a);
Rule 5A:27(a).

UNPUBLISHED

BACKGROUND[2]

On May 9, 2023, Boisseau and Ty'Quan White were employees of the housekeeping department of the Virginia Commonwealth University (VCU) Medical Center North Hospital.[3] They worked the third shift from 11:00 p.m. to 7:30 a.m. As a "trash tech," Boisseau was primarily responsible for handling and properly disposing of the different types of trash throughout the hospital, including biologically hazardous trash ("bio" trash). White, on the other hand, was primarily responsible for cleaning the stairwells of the hospital, but he also assisted with trash collection when needed.

That day, at the beginning of their shift, Boisseau and White attended a departmental meeting regarding specific work assignments. At this meeting, Rosanell McCoy, the housekeeping operations manager, asked that White, in addition to cleaning stairwells, assist Boisseau and another housekeeping employee with regular trash collection. Later, McCoy asked that Boisseau begin his shift by handling the "bio trash." At 11:50 p.m., she sent to Boisseau a text message asking that he first take out the "red bins," which were the containers containing biological waste. At 12:05 a.m., however, McCoy received two short text messages from Boisseau. The first message read, "I shot [T]ariq." The second message read, "North [O]ne." McCoy believed this message referred to White because she did not know anyone named "Tariq" and White was working on "North One," which was the first floor of the North Hospital.

---

[2] According to familiar principles of appellate review, we will state the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In addition, "we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Id.* (quoting *Gerald*, 295 Va. at 473).

[3] Although the spelling of White's first name in the trial transcripts is "Tyquan," the spelling in the murder indictment, the certificate of analysis, and the autopsy report is "Ty'Quan." Accordingly, "Ty'Quan" is used in this opinion.

Upon receiving 911 calls, VCU police and Richmond police went to the VCU Medical Center North Hospital. After a brief search of the hospital, Richmond police officers found White lying unconscious in a pool of blood in a stairwell on the second-floor landing. He had a single gunshot wound in his chest, and no weapons were on or around his body. After eight minutes of resuscitation efforts failed, White was pronounced dead. A forensic autopsy confirmed that White died as the result of a single bullet, which entered his chest in a downward, front-to-back trajectory.

Hospital security officers and Richmond police officers found Boisseau "pacing back and forth" on the brick walkway outside of the North Hospital's first floor. On a brick half wall was an unloaded handgun next to a backpack. Boisseau said to them, "I shot Tyquan, I shot Tyquan." He explained that "the other guy was trying to play manager, and that they make the same amount of money." He also said that "[h]e's always trying to tell him what to [do]." Boisseau then "started asking question[s] about if he was going to get in trouble, and [that he was] not sure if he should have shot him." A forensic analysis of Boisseau's firearm and the bullet recovered from White's body confirmed that the fatal bullet was discharged from this firearm.

Charged with first-degree murder and using a firearm while committing murder, Boisseau demanded a trial by jury and entered pleas of not guilty. As reflected by defense counsel's opening statement, Boisseau did not dispute that he shot and killed White, but he claimed that he did it in self-defense.

During the Commonwealth's case-in-chief, Levia Hardy testified as the sole eyewitness to Boisseau's shooting of White. On that day, Hardy was a hospital employee working as a secretary covering both first and second floors of the North Hospital ("[N]orth [O]ne" and "[N]orth [T]wo"). As a fellow hospital employee, she had known White "[o]n and off" for about

- 3 -

one-and-a-half years. She also knew Boisseau "in passing" and knew what he looked like. From her desk, Hardy could see the main hallway and the elevator for the first floor.

Shortly before midnight, while seated at her desk, Hardy was looking into the hallway from the exit doors of her office and saw the elevator door open. She observed White and Boisseau walking side-by-side out of the elevator.

As White and Boisseau exited the elevator together, they were talking loudly. At first, Hardy thought they were having a casual conversation and were "play arguing," but then she realized that "it was serious." White was holding a duffle bag and appeared to be preparing to "clock[] out of work" and leave. Although she could not hear everything being said, Boisseau appeared to be "telling [White] something and [White] didn't like it" because White dropped the duffle bag and said to Boisseau, "[D]on't talk to me like that." At the same time, he "took a "fighting stance" with about "an arm's length" or three feet of space between him and Boisseau. Afterwards, White swung at Boisseau's face with his right fist, but he did not make contact. From Hardy's perspective, this swing was "brief" and "it wasn't even hard." She described it as a "soft punch" because White did not step back to put any force into it and Boisseau did not need to "duck" or step back to avoid it. He just slightly drew back his head. After the one swing that missed Boisseau, White did not attempt any other physical contact with him. "He never had the opportunity." In response, Boisseau did not swing back at White. Instead, less than two seconds later, he "drew his weapon," shot White, and fled the scene. After White was shot, he ran into the stairwell and collapsed. As estimated by Hardy, the entire interaction between Boisseau and White on her floor only lasted two minutes. At no time did Hardy see White with a weapon or anything other than his duffel bag.

After the Commonwealth rested its case, Boisseau moved to strike the evidence as insufficient to prove malice, premeditation, and deliberation. In so doing, he also argued that, as

a matter of law, the evidence was insufficient to find that he was at fault in causing White to act in a way that later required him to act in self-defense.[4]  The trial court, however, denied the motion, asserting that whether Boisseau acted with malice and premeditation was a jury question.  In reaching this decision, the trial court focused on Hardy's repeated in-court demonstrations of White's "punch-like swing" at Boisseau.  "[E]very time she did it, she did it in [a] very[ ] deliberate sort of slow manner," which "sort of implied that it was almost not really even an attempt to hit him."  The trial court commented that the jury could find from the evidence, either directly or inferentially, that Boisseau acted with malice and premeditation in responding with deadly force to "an almost insincere gesture" capable of being alternatively characterized as "li[ght]," "not even severe," "mocking," or a "warning."  The trial court characterized Boisseau's reaction to White's action as "huge and disproportionate."

Thereafter, Boisseau testified in his own defense.  As the only other eyewitness to the May 9 incident, he presented a different account of the events leading up to his shooting of White.  According to Boisseau, although he and White were VCU hospital employees in the housekeeping department and they worked the third shift, he did not know White, and he had not previously spoken to him.  He testified that, like every other workday, he used public transportation to get to work and he had to walk four or five blocks at night in a high-crime neighborhood to catch the bus.  As the victim of a past violent robbery, he said he carried a concealed handgun in his jacket for personal security.  He also carried his concealed weapon permit that he had lawfully obtained.  Unbeknownst to him, the hospital had a policy prohibiting its employees from carrying guns on hospital grounds.

---

[4] In asking the trial court to strike the evidence as to the issues of malice and premeditation, defense counsel said, "And, I also think it, I believe there may be an error in the lesser included self-defense with fault, and I am arguing that's not here."  Then later, he said, "This man, it could not be less of his fault, either."

- 5 -

Boisseau detailed his interactions with White. After the housekeeping departmental meeting at 11:00 p.m., White, while moving a trash bin, passed Boisseau near the second-floor break room and said, "[Y]ou supposed to be helping with the trash and you not fucking helping." Boisseau said that he did not respond. Instead, he walked back into the break room to "[g]rab [his] stuff" to "[g]o home," even though he had just started his shift and would lose a night's pay. Blaming this encounter with White, Boisseau said he "felt confrontation" and he "always just [left] any time a co-worker [said] something to [him] unless it's [his] manager." He then left the break room to talk to his manager. He did not want to get any "points" for leaving work early.

While "on [his] way to [his] manager's office," Boisseau said he again encountered White at the elevators on the second floor. This time, referring to another employee with White, Boisseau said to White, "[S]ince you want to say something to me about the trash, you can come help him." White, in turn, told Boisseau that, "if he [had] a problem with it, [they] could talk about it." In response, Boisseau said, "Whatever." Afterwards, White said nothing and "grabbed his stuff off the ledge."

After Boisseau pushed the button for an elevator, the doors opened, and White entered the elevator ahead of him. Upon stepping into the elevator and noticing that White had pushed the button for the eighth floor, Boisseau stepped back out of the elevator and said to White, "I am not going up there." Boisseau said that he had never been on the eighth floor and he did not know what was on that floor. He then said to White, "[I]f anything, we can go outside. I'll meet you down there." In response, White said, "[N]awh, come on." Believing that White was telling him "to get back on the elevator," Boisseau refused and decided to use the stairs instead.

As Boisseau began to walk down the stairs, White "brushed" past him and walked ahead of him. As a result, Boisseau followed White down the stairs, but "a set of steps" separated the two men. At this time, Boisseau still possessed his gun, but he testified that he did not want to

fight even though he was "upset" and White had an angry demeanor that he had not previously experienced. Boisseau said he was upset because White was his "co-worker and not [his] manager" and they made "the same amount of money." He felt that White should speak to his manager and his manager, in turn, should speak to him.

Upon reaching the first floor, White and Boisseau exited the stairwell and walked towards another stairwell door in the hallway. White walked ahead of Boisseau, and he approached sliding doors that provided outdoor access. As White stepped in front of the sliding doors, they opened. Motioning to Boisseau who was six feet away, White "told [Boisseau] to come out and go outside first." In response, Boisseau said that he was "not ready to fight." While making this statement, Boisseau had his right hand in his front right jacket pocket that concealed his handgun. In so doing, he had a hand on a firearm that was loaded with one bullet in the chamber. Boisseau said that he had kept his right hand in his jacket pocket ever since he left the break room. Thus, during his interaction with White, Boisseau had his right hand in his jacket pocket "the whole time."

As White stood in the hallway with his body facing a bathroom door, he was standing "sideways" to Boisseau and had "stuff" in his right hand. Deciding to call his manager to report that White wanted to fight him, Boisseau testified that he "grabbed" his cell phone with his left hand as he removed his hand from his pants pocket. White then "dropped his stuff" and lunged at Boisseau. With his right hand, White grabbed Boisseau's left arm. Boisseau, in reaction, extended his left arm and "felt [White's] hand slide down his arm." He then "pushed [White] off with one hand," but White still held onto him even after his hand slid down closer towards his pants pocket. When Boisseau felt White's left hand also slide down towards his right pants pocket and was "near his gun," Boisseau testified that he feared for his life. White was "aggressive" and Boisseau said he "felt that he was going to take [his] gun and use it against

- 7 -

[him]." So, he "yanked [his] gun out" of his jacket pocket and fired once. At the time of the shot, Boisseau's gun was "high up" because White was pushing up his arm with his hand while Boisseau was trying to "get his arm off of [him]." By his own estimate, Boisseau was one foot away from White when he shot him. During direct examination, Boisseau testified that he did not want to kill or hurt White.

During cross-examination, Boisseau admitted that his entire argument with White was about a trash bin and "this argument escalated to the point where he shot and killed him." He also admitted that, when he and White were on the second floor, he said to White, "If anything[,] we can go outside, you can meet me down there." But he denied that he was talking about meeting White "for a fight." He testified that he just told White to meet him downstairs "to not look like a bitch" and "to get him off the elevator." He also denied knowing or believing that, despite having a concealed weapon permit, he could not possess a firearm on hospital grounds. He said, "I thought that was kind of the point of the license."

Regarding his shooting of White, Boisseau made several admissions. He admitted that he never saw White with a weapon and White never said that he had one. He also admitted that the only physical contact that White made with him was "at the very end when [he] shot him." He further admitted that, after telling White that he could meet him on the first floor and they could go outside, he followed White down the stairs. He also admitted that, during his argument with White, he "was cursing at [him]."

In addition, Boisseau admitted that, at any time during the argument, there was "nothing stopping [him] from walking away," but he never walked away and, right before shooting White, he "stood [his] ground" while holding a gun in his pocket in front of him. Finally, he admitted that he never texted his supervisor to tell her that White was "confronting" him and to ask her to "help him with White."

At the conclusion of all the evidence, Boisseau renewed his motion to strike the evidence as insufficient to prove premeditation and malice. He thus asked the trial court to strike the evidence as to the first-degree murder charge and the lesser-included charges of second-degree murder and manslaughter and, in turn, the firearm charge as well. The trial court denied the motion.

Thereafter, Boisseau asked the trial court to give a jury instruction for justifiable self-defense. The instruction for justifiable self-defense followed the model jury instruction, Criminal Model Instruction No. 33.800.[5] Boisseau argued that he was without fault because "he brought on no confrontation" and White was "the aggressor." The Commonwealth objected to this instruction and the jury instruction for excusable self-defense.

The trial court decided to give the excusable self-defense instruction but refused to give the justifiable self-defense instruction. Referring to Hardy's and Boisseau's different accounts of the shooting, the court stated that it did not see how "under either analysis of the facts" the jury could find that Boisseau was "totally without fault." Before making this ruling, the trial court recalled Boisseau's testimony that he said to White, "If anything, we can go outside and you can meet me down there." The trial court then said, "So to say that that's not contributing to some

---

[5] This instruction read:

> If you believe that the defendant was without fault in provoking or bringing on the difficulty, and you further believe that:
>
> (1) He reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in imminent danger of great bodily harm; and
>
> (2) He used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,
>
> then the killing was in self-defense, and you shall find the defendant not guilty.

degree in the difficulty from which the shooting arose would be hard for me to imagine." The trial court further recalled that Boisseau testified that, after making the statement to White, he and White "went downstairs together" even though, by his admission, "he could have left." Noting that Boisseau was in a "big hospital" with a "lot of exits," the trial court found that "[h]e could have gone somewhere else." It thus reasoned that "in a way [Boisseau] sort of challenged [White] and then followed him downstairs."

The jury subsequently found Boisseau guilty of second-degree murder and using a firearm while committing murder. This appeal follows.

ANALYSIS

I.

In his first assignment of error, Boisseau alleges the trial court erred in not giving a jury instruction on justifiable self-defense. Citing *Yarborough v. Commonwealth*, 217 Va. 971 (1977), and relying primarily on his trial testimony, Boisseau argues that he "ha[d] no part in bringing about" the shooting incident. He contends White initiated the men's encounter, instigated their argument, and "lunged" at him, which involved White's "overt act" of grabbing his arms and sliding his left arm towards Boisseau's right pocket containing his firearm. Asserting that this overt act "put [him] in imminent fear of great bodily injury and . . . loss of his life," Boisseau argues that he was entitled to a justifiable self-defense jury instruction. We disagree.

On appeal, "[t]he trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Witherow v. Commonwealth*, 65 Va. App. 557, 565 (2015) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Beck v. Commonwealth*,

- 10 -

253 Va. 373, 385 (1997)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

This Court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002).

"[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Payne v. Commonwealth*, 292 Va. 855, 869 (2016) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 228 (2013)). "Thus, "[w]hile both the Commonwealth and the defense are entitled to have the jury instructed as to their theory of the case, '[j]ury instructions are properly refused if not supported by more than a scintilla of evidence.'" *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). Although our courts have not defined "scintilla," and the term has "a generally accepted meaning of 'a spark' or 'the least particle,'" we have emphasized that "the precise limitations of this term must necessarily be determined in the factual context of a particular case." *Brandau v. Commonwealth*, 16 Va. App. 408, 411 (1993) (quoting *Black's Law Dictionary* 1345 (6th ed. 1990)). Hence, we have held that "[t]he determination whether the minimum quantum of credible evidence supports a particular proposition is largely a factor of determining the weight of that evidence in comparison to the weight of the other credible evidence that negates" it. *Id.* at 411-12. Additionally, we have emphasized that, "[i]n determining whether evidence amounts to more than a scintilla, 'we must look at the evidence in

the light most favorable to [appellant].'" *Bell*, 66 Va. App. at 486 (alteration in original) (quoting *Herbin v. Commonwealth*, 28 Va. App. 173, 181 (1998)).

"Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'" *Commonwealth v. Cary*, 271 Va. 87, 99 (2006) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993). Accordingly, "[t]he trier of fact determines the weight of evidence in support of a claim of self-defense." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002) (quoting *Gardner v. Commonwealth*, 3 Va. App. 418, 426 (1986)).

"'Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault,' referred to as justifiable self-defense, and 'self-defense with fault,' known as excusable self-defense." *Washington v. Commonwealth*, 75 Va. App. 606, 617 (2022) (quoting *Bell*, 66 Va. App. at 487). "Justifiable homicide in self-defense occurs where a person, without *any* fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958) (emphasis added). In contrast, excusable homicide in self-defense

> occurs when the accused is at "some fault in the first instance in provoking or bringing on the difficulty" but, when attacked, he "retreats as far as possible, announces his desire for peace," and acts "from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm."

*Washington*, 75 Va. App. at 617 (quoting *Bell*, 66 Va. App. at 487).

Thus, "[j]ustifiable self-defense differs from excusable self-defense because it does not necessitate that a defendant retreat and make known his desire for peace, two requirements of

excusable self-defense." *Bell*, 66 Va. App. at 487. More importantly, justifiable self-defense differs because it requires that the defendant be completely without fault. "The law of self-defense is the law of necessity, and the necessity relied upon must not arise out of defendant's own misconduct." *Hughes*, 39 Va. App. at 464 (quoting *McGhee*, 219 Va. at 562). "If a defendant is even slightly at fault, the killing is not justifiable homicide." *Perricllia v. Commonwealth*, 229 Va. 85, 94 (1985); *see also Dodson v. Commonwealth*, 159 Va. 976, 981 (1933) (stating that, in the case of a justifiable homicide, "the slayer is in no kind of fault whatsoever, *not even in the minutest degree*" (emphasis added)).

"The meaning of fault in excusable homicide is no different from the meaning of that word in its common usage." *Bell v. Commonwealth*, 2 Va. App. 48, 58 (1986). The same can be said for its meaning in justifiable homicide. Fault pertains to "any form of conduct on the part of an accused which a jury may reasonably infer from the evidence to have contributed to an affray." *Id.*; *see also Scott v. Commonwealth*, 143 Va. 510, 516 (1925) ("The misconduct contemplated by the law [of self-defense] is not confined to the physical acts of the chief assailant, but contemplates, extends to, and includes such violent and indecent language as is well calculated to provoke a breach of the peace."). Thus, a defendant "may deprive himself of the right of self-defense by words as well as by acts." *Id.* at 517.

By one's words, a defendant can act with fault in "provoking or bringing on the difficulty" leading to homicide by either starting an argument with the victim or continuing an argument started by the victim. In *Scott*, for example, the defendant confronted the victim and started calling his father "a bootlegger and a gambler." *Id.* at 514. When the victim told the defendant "not to talk like that," the defendant dared the victim to stop him if he could. *Id.* Although the victim struck the defendant with the first blow, the defendant was deemed to have forfeited his claim of justifiable self-defense by his conduct. *Id.* at 517. Similarly, in *Adams v.*

- 13 -

*Commonwealth*, 163 Va. 1053 (1935), the defendant was not entitled to the defense of self-defense because, even though the homicide victim caused an argument with the defendant by uttering a "vile epithet," the defendant said to the victim, "We'll go in the street and settle it," thereby inviting the victim to go outside where he first struck the defendant and the defendant responded by fatally stabbing him. *Id.* at 1057. As the Supreme Court made clear, "[o]ne will not be permitted to invite another to commit a common assault upon him and then justify a repellent assault on the ground of self-defense." *Id.* at 1058.

More recently, in *Washington*, we held that the record supported the trial court's finding that the defendant "was not without any fault on his part in provoking or bringing about the difficulty" that led to her shooting the victim. *Washington*, 75 Va. App. at 618. In that case, the appellant approached the victim and yelled at her, calling her an "ignorant [W]hite cunt bitch." *Id.* (alteration in original). As the two exchanged heated insults, the defendant became "louder and more aggressive." *Id.* Eventually, during the verbal dispute, the defendant "removed his firearm from its holster and shot the unarmed victim while standing behind her." *Id.*

In this case, the trial court did not err in finding that there was insufficient evidence to support a jury instruction on justifiable self-defense. At trial, the Commonwealth and Boisseau presented different accounts of the actions of Boisseau and White leading up to the shooting. Neither account provided even a scintilla of evidence to support the finding that Boisseau was without *any* fault in the escalation of a disagreement over trash collection into a fatal shooting. In fact, the opposite is true. In different ways, each account provided more than enough evidence to find that Boisseau was at fault, either wholly or partially, for shooting and killing White.

Hardy's testimony provided no support for a justifiable self-defense instruction. In her account, Boisseau was, as a matter of law, at fault in provoking and bringing on the "difficulty" that led to his shooting of White. According to Hardy, Boisseau loudly argued with White and said

- 14 -

something that caused White to say, "Don't talk to me like that," drop his duffle bag, and assume a "fighting stance." Boisseau then used, in the trial court's words, "huge and disproportionate" deadly force in reaction to White's slow, punch-like swing that did not even touch him. Thus, in the Commonwealth's scenario, Boisseau was not without fault in causing White's death because he did not have the right to possess a firearm on hospital property and he did not have the right to use deadly force against White. "[T]he right to use deadly force in self-defense 'begins where the necessity begins and ends where it ends.'" *Couture v. Commonwealth*, 51 Va. App. 239, 251 (2008) (quoting *Thomason v. Commonwealth*, 178 Va. 489, 498 (1941)). Given Hardy's testimony, the necessity did not exist.

For different reasons, Boisseau's testimony also provided no support for a justifiable self-defense instruction. Even when his testimony is viewed in the most favorable light, a rational trier of fact must conclude that he was at fault in "provoking or bringing on the difficulty" that led to White's death. In three different ways, Boisseau's admissions during cross-examination provided the trier of fact with an evidentiary basis for finding that he was *not* "without any fault" in bringing about his violent and fatal altercation with White.

First and foremost, Boisseau "was cursing at [White]" during their argument. Thus, like the defendant in *Washington*, Boisseau cursed at his unarmed victim before their verbal dispute became violent. By his words alone, Boisseau "deprived himself of the right of self-defense." *Scott*, 143 Va. at 517.

Second, Boisseau said to White, "[I]f anything, we can go outside. I'll meet you down there." Thus, like the defendant in *Adams* who invited the victim to go outside by saying, "We'll go in the street and settle it," Boisseau invited White to extend their disagreement beyond the physical constraints of their initial argument. *Adams*, 163 Va. at 1057. Despite Boisseau's claim

- 15 -

that he was trying "to not look like a bitch" and "to get [White] off the elevator," implicit in his invitation was, at the very least, the promise of an escalation of the dispute.

Third, after telling White that they could "go outside," Boisseau followed White down the stairs to the first floor of the hospital even though there was "nothing stopping [him] from walking away." Thus, like the defendant in *Avent v. Commonwealth*, 279 Va. 175, 185 (2010), who resumed an altercation with his victim by following him to the top of the stairs where the victim struck him and he responded by shooting the victim, Boisseau resumed his dispute with White on the first floor where he used deadly force to repel what he "felt" to be White's attempt to "to take [his] gun and use it against [him]."

We thus hold that the trial court did not abuse its discretion in refusing to give a jury instruction on justifiable self-defense at the trial in this case. The record on appeal provides no basis for finding that Boisseau was without *any* fault on his part in provoking or bringing on his difficulty with White that led to fatally shooting him. Therefore, as to Boisseau's first assignment of error, we affirm the ruling of the trial court.

II.

In his second assignment of error, Boisseau alleges the trial court erred in not granting his "motion to dismiss" both charges based on the affirmative defense of self-defense and the claim of insufficient evidence of malice. Without explanation, however, he states in his opening brief that he "subsumes both [a]ssignments of [e]rror into one." Afterwards, he presents no principles of law and authorities for the sufficiency issue, as required by Rule 5A:20(e). We find this complete failure to comply with the briefing requirements of Rule 5A:20(e) to be significant and, therefore, we "treat the question as waived." *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017); *see also Muhammad v. Commonwealth*, 269 Va. 451, 478 (2005) ("Failure to adequately brief an assignment

of error is considered a waiver."). Therefore, we do not address the merits of the second assignment of error.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*